THE PEOPLE OF THE STATE OF NEW YORK ex rel. CHARLES W.
GRANNIS et al., Respondents, v. JAMES A. ROBERTS, as
Comptroller of the State of New York, Appellant.

1. STATE COMPTROLLER — POWER TO AUDIT CLAIMS A JUDICIAL FUNC-
TION — MANDAMUS WILL NOT LIE TO COMPEL AUDIT IN ANY PARTICULAR
WAY. The state comptroller, since the 1st day of October, 1897, when
the State Finance Law (L. 1897, ch. 413) went into effect, has been vested
with power to audit all claims, whether presented against the canal fund
or the general fund of the state, where payment out of the treasury is pro-
vided by law, and as such power requires him to hear, examine, pass upon,
settle and adjust claims, it involves a judicial function which he cannot be
required to exercise in any particular way by mandamus.

2. POWER TO AUDIT CLAIMS AGAINST STATE CANAL ENLARGEMENT
FUND NOT CONFERRED UPON STATE ENGINEER — L. 1895, CH. 79, § 5; L.
1896, CH. 794. The power to audit claims against the $9,000,000 fund
appropriated for enlarging and improving the state canals was not taken
away from the comptroller and conferred upon the state engineer by the pro-
visions of the statute (L. 1895, ch. 79, § 5, amd. L. 1896, ch. 794) directing
the superintendent of public works to pay contractors on such canal work
upon the certificate of the state engineer stating the amount of work per-
formed and its total value, as these are administrative duties necessarily
conferred upon the state engineer, and are entirely consistent with the gen-
eral practice of the state to have the final audit made by the comptrolle:.
People ex rel. Grannis v. Roberts, 45 App. Div. 145, reversed.

(Argued February 27, 1900; decided May 1, 1900.)

APPEAL from an order of the Appellate Division of the
Supreme Court in the third judicial department, entered
November 28, 1899, affirming an order of Special Term con-
firming the report of a referee and awarding a writ of per-
emptory mandamus directing the defendant, as comptroller of
the state of New York, to accept certain drafts and to provide
for the payment thereof.

The facts, so far as material, are stated in the opinion.

*T. E. Hancock* and *John C. Davies* for appellant. The
functions of the comptroller are judicial in their nature and
he cannot be compelled by mandamus to decide in any par-
ticular way, or to audit the account to the amount claimed by

the relators. (*People ex rel.* v. *Leonard*, 74 N. Y. 443; *People ex rel.* v. *Common Council*, 78 N. Y. 33; Wood on Mandamus, 10; Merrill on Mandamus, § 30; Short on Mandamus, 256; High on Ext. Leg. Rem. § 24; 14 Am. & Eng. Ency. of Law, 110; Const. of N. Y. art. 3, § 19; *Cole* v. *State*, 102 N. Y. 52.)

*Frank Hiscock* for respondents. Under the statute and the contract, the comptroller has no discretion to exercise and has no right to question the correctness of the certificate of the state engineer. The proper certificate having been furnished by the state engineer to the superintendent of public works, and the superintendent, in compliance with the statute and the contract, having paid for the work performed by his draft on the comptroller, the only duty resting upon the comptroller is to furnish his warrant for the payment of the drafts on the treasurer of the state of New York, and he may be compelled by mandamus to perform that duty. (Fiero on Spec. Proc. [2d ed.] 142; *Matter of Freel*, 148 N. Y. 165; *People ex rel.* v. *Mayor*, etc., 144 N. Y. 63; Code Civ. Pro. § 2070; *People ex rel.* v. *Davenport*, 117 N. Y. 549; *People ex rel.* v. *Wemple*, 115 N. Y. 302; *People ex rel.* v. *Morton*, 156 N. Y. 136; *People ex rel.* v. *Comrs. of Land Office*, 149 N. Y. 26; *Lawrence* v. *Mayor*, etc., 29 App. Div. 298.)

PARKER, Ch. J. The fact having been brought to the attention of the comptroller that the relators Grannis and O'Connor had made what is known as an unbalanced bid for the doing of certain work between locks numbers 61 and 62 on the western division of the Erie canal, he declined to pay the full amount of the drafts drawn upon him in behalf of Grannis and O'Connor, refusing to accept and pay such part of the drafts as represented about the sum of $30,000. Thereupon relators instituted this proceeding for the purpose of obtaining a mandatory order of the court requiring the comptroller to accept the drafts and pay the same in full. The comptroller, in his return to the writ, set up, among other

things, that the state engineer omitted to comply with the command of the statute, in that he did not estimate or ascertain with any accuracy whatever the quantity of rock excavation necessary to be done upon that portion of the canal affected by the Grannis and O'Connor contract, putting in the specifications 100 yards as the quantity of rock excavation, whereas the rock excavation was, in fact, more than 30,000 yards, and this led to a bid on the part of the contractors to excavate rock for three dollars a yard, which, on the basis of the contract, would amount to $300, whereas, in truth and in fact, down to the time when the comptroller refused to pay any more on the drafts, the so-called rock excavation already amounted to $90,000. The return further charged that the relators well knew at the time they signed the contract that there were a great many thousand yards of rock excavation to be done, and, further, that "there was no lawful competition among the bidders for said work, and the purpose of the law was thwarted, and the contract was not let to the lowest responsible bidder, as the law requires, but was let to the persons alone who, by deceit, concealment and fraud, had an opportunity to secure a pretended contract; that because of such fraudulent conduct the treasury of the state has been and will be depleted and the funds of the state wasted," and the return concluded with a prayer that the court declare such contract illegal and void. An alternative writ of mandamus was granted and the issues were brought on for trial before a referee, the attorney-general in person representing the comptroller with marked ability. It was shown that the rock excavation was not worth to exceed one dollar per yard, and that under the contract, if permitted to stand, the relators were entitled to three dollars per yard, so that for the 30,000 yards of rock excavation that had been done, worth $30,000, relators would receive $90,000, or $60,000 more than the work was fairly worth, a result which was fittingly characterized by the comptroller in his return as a waste of the funds of the state. Now, no one pretended on the trial that the taking of this $60,000 could be justified on any other prin-

ciple than because " it is so nominated in the bond," and so the real controversy before the referee was whether the contract was tainted with fraud, and, therefore, void.    The attorney-general contended that it was, and he found evidence tending in that direction in the fact that the state engineer had failed to com- ply with the statute requiring him to state in the specifications and in the contract the amount of rock excavation required, coupled with the fact that one of the firm of the relators had been over the work, and knew, at least, that there were a great many thousand yards of rock excavation, if he did not know exactly how many there were, prior to the execution of the contract.    While it was admitted that the state engineer did not put the correct number of yards in the contract and specifications, it was testified to that he did cause the survey to be made and did ascertain the quantity of rock excavation necessary in advance of advertising for bids, and the excuse offered for putting in 100 yards instead of 40,000 yards (for it seems there is still about 10,000 yards of rock excavation to be made), was that the estimates were in the division engi- neer's office at Rochester, an excuse which would have had more value when the canal was first built than now, when the space between the two cities can be covered at the rate of nearly sixty miles an hour.    While the contract was executed by the superintendent of public works, he had a right to rely upon the estimates made by the state engineer, and there is no hint in the record that he either suspected, or had reason to suspect, that the estimates contained in the specifications and contract had not been placed therein by the state engi- neer in strict conformity with the demand of the statute. The result of the trial was a finding by the referee that there was no collusion between the contractors and the state engi- neer by which this contract was brought about; no fraud attending the execution of a contract that has proved so help- ful to the pockets of the contractors and correspondingly depleting to the treasury of the state, and that finding having been, in effect, affirmed by the Appellate Division, we are without authority, under the Constitution, to consider the

question of fraud at all, and come now to an investigation of the contention of the attorney-general that the comptroller, having the authority to audit the claims against the state, including the canal claims, and having audited these claims, he cannot be compelled by mandamus to decide in any particular way, or to audit the account in the amount claimed by the relators; in other words, that, having audited the first draft of $43,794 at $27,846, and the second draft of $38,727 at $23,703, the court cannot now say that he should have audited at the full amount, and by mandamus compel him to do it, for that writ never issues to require the performance in a specified way of a discharge of a duty involving the exercise of judgment or discretion. This, of course, cannot be gainsaid if the comptroller possessed the authority to audit, and whether he did must be the subject of our next inquiry.

In the first place it should be noted that the Constitution contemplates that the moneys of the state should not be paid out without an audit, and the legislature is deprived of the power to audit. (Constitution, article III, sections 19 and 21; article VII, section 6.) Two facts must exist before any f the funds of the state can be paid out, first, an appropriation by the legislature and, second, an audit by such authority as the legislature may create for the purpose. The legislature in this case appropriated the moneys, which were the proceeds of certain bonds of the state, for the payment of canal claims, and it was its further duty to provide for an audit of such claim, unless the authority to audit already existed. It is suggested that it was provided that the state engineer should be the auditor for the canal claims arising during the expenditure of the $9,000,000 appropriation, but it is difficult to find in section 5 of chapter 79 of the Laws of 1895 and chapter 794 of the Laws of 1896 satisfactory evidence that the legislature intended to take away from the auditing officer of the state this important duty, a duty in harmony with his general work, and to confer it instead upon an officer who has never in the history of the state been treated as a fiscal officer in any sense. The section does not

contain the word "audit," nor refer to the superintendent of public works, except to direct that officer to pay the contractor or contractors upon certificate of the state engineer, stating the amount of work performed and its total value. These administrative duties were necessarily conferred on the state engineer and are entirely consistent with the general practice of the state to have the final audit made by the comptroller, and we should not hold that he has been deprived of that power unless the language employed by the legislature is free from doubt upon the subject, and that, I think, no one will be willing to say who examines the legislative history of the state so far as the subject of audits is concerned. The legislation of the state, from the first session down to the present time, has provided for the auditing of accounts by some state officer. At the first legislative session it was provided that accounts against the state should be audited by the auditor-general. (Laws of 1778, chapter 35.) In 1782 an act was passed providing for the appointment of an auditor, whose duty it should be "to audit, liquidate and settle all accounts now subsisting, or which may hereafter arise * * * between this state and any other person or persons whatsoever." (Laws of 1782, chapter 21.) In the year 1797 an act was passed providing for the appointment of a comptroller, who "shall do, perform and execute all matters and things whatsoever required by law to be done by the auditor-general of this state, * * * and to examine and liquidate claims against this state in all cases in which provision is or shall be made by law." (Laws of 1797, chapter 21.) The duties of the comptroller, as expressed in the State Finance Law (Laws of 1897, chapter 413) are (1) to superintend fiscal concerns of the state; (2) keep, audit and state all the accounts in which the state is interested; (3) keep correct and proper books, showing their condition at all times, and (4) examine, audit and liquidate the claims of all persons against the state if payment thereof out of the treasury is provided for by law.

As at certain periods of time the power to audit canal claims has been conferred upon other officers, an investigation of the

legislation in that direction becomes necessary in order to ascertain whether that power is at present in the comptroller. In the early history of the canal system of the state, the canal board and the commissioners of the canal fund had the control of the expenditure of the moneys relating to the canal, but the power of audit was lodged in the comptroller. Among other things, the commissioners of the canal fund were authorized to advance to the superintendents moneys for the necessary work upon the canals, but the statute provided that " each superintendent shall, as often as once in sixty days, render his account to the comptroller who shall audit the same." The papers connected with the management of the canal were required to be filed in the office of the comptroller. In the year 1833 an act was passed providing for the appointment of a second deputy comptroller who was specially authorized to perform any duties of the comptroller in relation to canals, except as a commissioner of the canal fund, and that act also provided that all papers relating to the canals should be deposited in the comptroller's office. (Laws of 1833, chapter 56.) In the year 1840 an act was passed which, among other things, provided for the appointment of a chief clerk by the commissioners of the canal fund, who should receive the compensation and possess the powers of the second deputy comptroller, which office was abolished. (Laws of 1840, chapter 288.) In the year 1848 the office of chief clerk of the canal department was abolished and the office of auditor of the canal department created, with all the powers and duties of the chief clerk of the canal department and all the powers and duties of the comptroller in relation to the canals ; all books, papers, etc., relating to the commissioners of the canal fund and the canal board were transferred to the auditor of the canal department, who was given power to hire clerks, issue warrants for the payment of money and countersign and enter all checks and keep account of all receipts and payments on the canals and the canal fund. The act also provided for the designation by the auditor in case of his absence or sickness of one of his clerks as an acting auditor who was authorized to perform

any of his duties as auditor, except the drawing of warrants on the treasury and the auditing of accounts. Engineers to whom advances were made by the canal commissioners were obliged to submit the accounts to the auditor for audit. (Laws of 1848, chapter 162.) There were subsequent amendments to the act of 1848, but none that attempted to limit in any wise the auditor's powers of audit over the canal accounts, and he continued to exercise the powers of audit thus broadly conferred upon him down to the year 1883, when the office of auditor of the canal department was abolished by chapter 69 of the laws of that year. The second section of that act reads as follows: " All the powers and duties heretofore exercised by and enjoined upon the auditor of the canal department shall hereafter be performed by and incumbent upon the comptroller," etc., and thereupon the comptroller was reinvested with the power which formerly belonged to that office of auditing all the claims and accounts relating to the canals, but which had been for a time conferred upon another officer. This act was repealed by the General Repealing Act prepared by the commissioners of statutory revision, and known as chapter 548 of the Laws of 1896. The revisers in a note appended to the act as it was presented to the legislature said: " The object of this bill is to repeal certain statutes and parts of statutes which are supposed to have become obsolete, or which have been superseded by special legislation, or the substance of which has been merged in other statutes; only those (statutes) have been included in the bill which we think are clearly obsolete, or which have been superseded by other statutes or merged in them." At the same time the commissioners of statutory revision presented to the legislature for passage, among other bills, one known as the State Finance Law, and as its provisions relating to the power of audit were abundantly comprehensive to include the power to audit canal claims as well as others against the state, we find the reason for the repeal of the act of 1883 in the note to which we have referred. It was regarded that the substance of it had been merged in the State Finance Law. Such, I think, would have

been the effect had the State Finance Law been adopted in the year 1896, but it failed of passage while the repealing act was enacted. A year later, however, the State Finance Law was passed. (Laws of 1897, chapter 413.) For the period of about one year intervening the enactment of the repealing act of 1896 and the passage of the State Finance Law of 1897, the comptroller was without power to audit claims and accounts presented against the canal fund, but the passage of the latter act reinvested him with the power, which it was never intended to take away, to audit all claims against the canal fund as well as against the general fund. In the light of the history of the auditing of accounts in this state, both against the general fund and the canal fund, and the final vesting of the power in the comptroller, where it has been since 1883, with the exception of one year, for which period by the accident rather than the design of legislation, the power was taken from him only to be restored again, it would seem to be quite absurd to argue that there is to be found any language in the acts of 1896 and 1897 which would indicate an intention to confer upon the state engineer power to audit, and to take that authority from the comptroller in whom it was clearly vested at the time of the passage of the act of 1895.

Our conclusion then is that since the first day of October, 1897, when the State Finance Law went into effect, the comptroller has been vested with the power to audit all claims, whether presented against the canal fund or the general fund of the state, where payment out of the treasury is provided by law, which, of course, includes this claim. The auditing of an account by the comptroller involves a judicial function. He is required in the language of the books "to hear, to examine, to pass upon, to settle and adjust." That function he cannot be required to exercise in any particular way by mandamus, for, as was said by Judge VANN in *People ex rel. Harris* v. *Commissioners* (149 N. Y. 26), "That would substitute the judgment or discretion of the court issuing the writ for that of the person or persons against whom the writ was issued."

As the comptroller's position is well taken, the judgment of the Appellate Division should be reversed and the proceeding dismissed, with costs.

O'BRIEN, BARTLETT, HAIGHT and MARTIN, JJ., concur; VANN, J., dissents; LANDON, J., not sitting.

Judgment reversed, etc.