Fuchsberg, J.
These two cases, bearing Court of Claims Nos. 47847 and 52436, respectively, were brought by the City of New York to obtain reimbursement from the State for certain interest paid by the city on awards for properties taken by it in condemnation in furtherance of a federally sponsored interstate highway program. The costs of the acquisitions were to be fully reimbursable to the city by the State (New York State Highway Law, § 340-b, subd 5); the State, in turn, was entitled to get 90% of its expenditures back fro: the Federal Government (Federal-Aid Highway Act of 1956, 70 US Stat 374).
The city’s primary liability as condemnor included not only damages for the parcels themselves but also for interest on such damages from the date each title had vested in the city until the date when payment was actually made to each condemnee. The State, however, reimbursed the city for interest on each award for no more than one year after the vestings. The city now seeks repayment of an aggregate of $1,696,692.61 for interest it expended to cover periods of time beyond the first year.
In both cases, the Court of Claims held the additional interest payments reimbursable items as a matter of law. It thereupon granted the city’s motion for summary judgment on the particular cause of action in Claim No. 52436 to which that motion has been directed by agreement of the parties. It *661 denied the State’s cross motion as to the entire claim (64 Misc 2d 421). In Claim No. 47847, however, the court dismissed on the ground that the claim had not been filed with the court "within 6 months after the accrual of such claim” as required by subdivision 4 of section 10 of the Court of Claims Act (61 Misc 2d 517). The Appellate Division, on the sole ground that the additional interest was not reimbursable as a matter of law, reversed and dismissed in No. 52436 (49 AD2d 641) and affirmed the dismissal in No. 47847 (49 AD2d 644); it did not reach the timeliness issue. For the reasons which follow, we conclude that the additional interest was reimbursable to the city and therefore we. reach the timeliness question as well.
The resolution of the issue of reimbursibility of the additional interest is largely dependent upon how one reads subdivision 5 of section 340-b and subdivision 3.3 of section 349-c of the Highway Law.
Subdivision 3.3 of section 349-c was the first of these two statutes to be adopted. Directed to the modernization and construction of intrastate arterial highways, as enacted in its original form by chapter 543 of the Laws of 1944 and as amended by chapter 619 of the Laws of 1945, it provided that the "costs and expenses” of the necessary property acquisitions for such highways within the city were to be borne "fifty per centum by the state and fifty per centum by such city”. Apparently because such a large share of State money was to go into the cost of the acquisitions controlled by the city, the statute contained a number of restrictions on the costs to which the State’s 50% share was to apply. They were to be computed only on the basis of the State’s own Superintendent of Public Works’ "estimate” of the value of property taken rather than what the city actually paid,[1] and interest on awards was to be shared only to the extent incurred within one year after the city had taken title. It is noteworthy that these provisions directly dealt with the substantive matter of the extent of the costs the State was to share in paying.
Subdivision 3.3 of section 349-c also set forth the procedural path which had to be followed before the city could obtain reimbursement from the State for the share to which the *662 latter was committed. Among other things, the city’s Corporation Counsel had to certify that the city had title to the property, the State’s Attorney-General had to certify to the State Comptroller that such certification of title was adequate, the city had to furnish a "certificate stating the amount” due it and, bearing most significantly on the issue of timeliness in the cases before us here, the amounts so certified were to be paid only "after audit by the state comptroller”.
Section 340-b, on the other hand, was directed solely to interstate highways. First enacted 12 years after 349-c, by chapter 651 of the Laws of 1956, it implemented the State’s plan to avail itself of the generous benefits of the then freshly enacted Federal-Aid Highway Act, under which the Federal Government offered to provide fully 90% of the cost of the vast highway construction it contemplated as against but 10% of State "matching” funds. The Federal act made no direct provision for participation by cities or other local governments as such. Through 340-b, the State of New York, however, decided to provide for the involvement of its cities in the implementation of its participation. In the course of doing so, by chapter 707 of the Laws of 1957, it adopted an amendment to then subdivision 5 of section 340-b which states, in pertinent part, that: "interstate highways shall be acquired by the city of New York in the same manner as provided in section three hundred forty-nine-c of this chapter relating to the acquisition of property for the state arterial system in the city of New York, except that the city shall be reimbursed in full for the costs and expenses incurred by such acquisitions for interstate highways subsequent to the enactment of the federal aid highway act of nineteen hundred fifty-six, in the manner as provided in section three hundred forty-nine-c of this chapter relating to reimbursement of costs and expenses of acquisition for the state arterial highways(Emphasis added.)
It was while acting under that statute that the city incurred and paid the interest obligations which are the subject matter of the cases before us. The crux of the State’s position is that the phrase "in the same manner as provided in section three hundred forty-nine-c” means that all portions of subdivision 3.3 of section 349-c, including the one-year interest limitation, have been imported into subdivision 5 of section 340-b. The city takes a more restrictive view. It reads the incorporation by reference of section 349-c into subdivision 5 of section 340-b *663 as limted by its language to the procedures set forth in subdivision 3.3 of section 349-c for the approval and processing of the reimbursement vouchers submitted to the State. The interest limitation, it points out, is not a procedural matter, in these cases being as substantive as $1,696,692.61.
On that question, it appears to us that the words "in the same manner” on their face do indeed yield an intent to treat only with the methods or procedures by which property was to be acquired and the city reimbursed. That connotation is reinforced both by the significant specification in the clause commencing with the word "except” that the city’s reimbursement for costs and expenses incurred in the interstate highway acquisitions was to be "in full”[2] as well as by the fact that subdivision 5 of section 340-b’s second reference to 349-c is again qualified by the words "in the manner” in a way that manifestly affects its meaning. Pertinent too is the comment of our own court in defining the nearly identical phrase "in like manner” in Matter of Niagara Falls Power Co. v Water Power & Control Comm. (267 NY 265, 277): "The provision in the statute (§ 614, subd. 13, supra) that the rental shall be fixed 'in like manner as if the application was made for a license’ simply means that the procedure employed in the issuance of licenses is applicable. (Conservation Law, § 616, subd. 1.) It cannot be construed to mean that the amounts and kind of rental found in the licensing section (§ 616) are to be bodily lifted out of that section and incorporated into section 614, subdivision 13. The reference is made, not to qualify the *664 substance of subdivision 13 but merely to provide a means for formal execution.”
Furthermore, the importation into subdivision 5 of sectior. 340-b of the one-year interest limitation found in section 349-c would not accord with the former’s legislative history and purpose. As already indicated, subdivision 5 of section 340-b was enacted in a totally different context than was section 349-c. The distinction between the almost equal division of financial responsibility between State and city contemplated by section 349-c for the intrastate program and the far different intent under subdivision 5 of section 340-b "to relieve cities of the obligation to participate in the cost of property acquisition for interstate highway routes”, including that for the interest items here involved and for which the Federal Government had in any event assumed the lion’s share, is simply too striking to be overlooked (see Governor’s Memorandum, NY Legis Ann, 1957, pp 510-511). It is also evident in subdivision 4 of section 340-b by which the State gave express assurance that, except in circumstances not relevant here, "[n]o city shall be required to participate in the costs of an interstate highway project”. The product of Court of Claims Judge Sidney Squire’s obviously exhaustive research and thoughtful analysis, set out at length in his opinion in Claim No. 47847 (61 Misc 2d 517), further reinforces our conclusions that, consistent with the legislative design itself, only the procedural aspects of subdivision 3.3 of section 349-c were referentially incorporated into subdivision 5 of section 340-b, that the interest with which we are concerned is a substantive matter and that its reimbursement was not limited to a one-year period under subdivision 5 of section 340-b.
So read, subdivision 5 of 340-b also accords with the spirit as well as the letter of section 16 of article III of the New York State Constitution, whose proscription against the incorporation by reference of the terms of one statute into another has been construed by us to apply to substantive rather than procedural matters (People ex rel. Everson v Lorillard, 135 NY 285; see, also, Knapp v Fasbender, 1 NY2d 212).
We note too that the city, by its efforts between 1961 and 1968 to obtain legislative clarification which would eliminate any further possibility of differences on this point, did not waive its right to seek judicial interpretation of the statute as it existed and as it applied to the city in the cases now before us (see Flanagan v Mount Eden Gen. Hosp., 24 NY2d 427, *665 433). Nor, for that matter, may the 1968 Legislature’s ultimate resolution of the issue[3] be held dispositive of the earlier legislative language and intent, most particularly in view of the fact that the city succeeded at least twice in obtaining passage in both houses of a bill in accord with its view, only to have it vetoed by the Governor. It is clear from the checkered legislative career of the city’s proposed bill during those years that the legislators were then concerned solely with what would be best for New York City and for the State in futuro and not with what the intent or meaning of the previously enacted legislation may have been (see Waterman S. S. Corp. v United States, 381 US 252, 268-269). Moreover, the Legislature by no means indicated an unwillingness to adopt the city’s reading of the statute as it existed when the extra interest was expended.
Confronting the issue of timeliness, we now turn first to the simpler of the two cases, Claim No. 52436. It covered interest on but four condemnation matters, all of which were embraced within one of the three pleaded causes of action. It is undisputed that the titles involved vested on July 1, 1966, that the final awards were made on November 13, 1968 and that each was paid either on May 29, 1969 or September 22, 1969. Vouchers for the payments due the city, including interest in excess of that for one year, were submitted on December 13, 1969. Claim No. 52436 was served on April 29, 1970. Thus, suit was started less than five months after the vouchers had been filed, and we, therefore, hold that the order of the Court of Claims which correctly found it timely should be reinstated.
Claim No. 47847 is more complex. Relating to an earlier period of time, it embraces 86 different interest claims whose vouchers requesting payment had been submitted on various dates between August 30, 1960 and April 22, 1966. On August 30, 1960 a single claim was submitted. The record does not indicate its fate. Early in 1961, the city submitted what it calls its first batch of claims, designated as numbers 1 through 10 and 12, each of which included the full amounts of interest the city had paid to condemnees. Controversy arose almost immediately as to whether interest beyond one year was payable to the city, and very soon the situation became *666 muddied. Self-serving memoranda flew between various internal agencies of the two parties, in part to air a dispute as to whether at a meeting of undefined "top level” officials, held before the Federal funding program had been undertaken, an understanding, dehors the statute, had been reached that the city would not seek interest for more than one year after the vesting of titles. Apparently that dispute has never been resolved to this day.
Finally, the State Department of Public Works sought the advice of the State Attorney-General, who supplied an opinion indicating that, as he read the statutes involved, the city was not entitled to interest beyond one year (1961 Opns Atty Gen 38, 41). More letters and memoranda ensued, the gist of which was that the city was free to take the matter up with the Attorney-General if it wished to do so, but that the Department of Public Works intended to abide by the Attorney-General’s advice until further developments. A conference between the city and the State was suggested but never took place. However, neither party acted as if its position on the matter was fixed. To the contrary, the Department of Public Works advised the city to follow a procedure under which it would submit a primary voucher for the principal amount and first year’s interest on each parcel condemned and a supplementary, separate voucher for the excess interest it sought, so that payment of the undisputed amounts need not be delayed by the open question on the others. The city acted on this advice for the initial claims and used the suggested procedure in all subsequent submissions as well, noting on each primary voucher that it reserved its right to seek the full amount it felt was owed. Thereafter, it never deviated from that procedure. As is not surprising in light of the fact that it was its own Department of Public Works which fathered the idea, the State never objected, orally or in writing, to these split filings.
From mid-1962 until mid-1966 matters proceeded on this basis. The city regularly submitted both first-year and post-first-year vouchers for each parcel of property it condemned and the State just as regularly ignored the latter; its comptroller neither audited and paid nor audited and rejected the secondary vouchers for the additional interest payments. The city, as noted, sought legislative relief from the impasse but without success through 1966. Discouraged by its attempts to resolve the issue by nonconfrontational means, the city, on November 14, 1966, gave written notice to the State Comptrol *667 ler that it would deem its claims rejected if they were not audited within 60 days of the date of the letter. No audit was forthcoming and, on March 9, 1967, less than six months after the expiration of the 60-day period specified in the city’s letter, Claim No. 47847 was instituted.
The State takes the position that the city’s claims for which it submitted vouchers prior to the issuance of the Attorney-General’s opinion on October 6, 1961 accrued when the city soon thereafter learned of that opinion and that all claims subsequent to that time accrued, at the latest, when the city received the partial payments on the primary vouchers associated with those claims. The city, for its part, contends that no claim can be considered to have accrued until the State Comptroller has audited and rejected it. It bases this contention on the specific language of subdivision 3.3 of section 349-c that the city shall be paid only "after audit by the state comptroller”.
The difficulty with the State’s position is at least two-fold. First, the Attorney-General’s opinion could not substitute for the audit required of the State Comptroller, who is the only official upon whom subdivision 5 of section 340-b imposes that duty (cf. Reuter v Town of Babylon, 40 AD2d 710; Terry Contr. v State of New York, 27 AD2d 499; Tilden Constr. Corp. v State of New York, 30 AD2d 612). Secondly, it is clear, both from our Constitution and our case law, that the State Comptroller, who independently may issue his own opinions (see Matter of New York Cent. R. R. Co. v Tremaine, 243 App Div 181), in the exercise of his power to audit acts in a quasi-judicial capacity (see NY Const, art V, § 1; People ex rel. Grannis v Roberts, 163 NY 70 [detailing the legislative history of the Comptroller’s powers and duties under our Constitution]; People ex rel. Desiderio v Conolly, 238 NY 326, 333 [noting that the power to audit is the power to "hear and examine, and thereupon to allow or to reject” (Cardozo, J.). Indeed, our courts have long held that the power of an official charged under law with the responsibility of auditing claims against a governmental entity is subject to mandamus only to the extent that such an official may be compelled to perform the audit; his results are subject to no such compulsion whether from the courts or, as in this case, from an opinion of the Attorney-General on a point of law (see Matter of New York Cent. R. R. Co. v Tremaine, supra; Matter of Equitable Trust Co. of N. Y. v Hamilton, 226 NY 241; People ex rel. *668 Grannis v Roberts, supra; People ex rel. Desiderio v Conolly, supra; cf. Rice v State of New York, 55 Misc 2d 964).
Therefore, the language imposing the requirement of a comptroller’s audit creates a precondition to the right to receive payment that is most consequential (see Tennessee Gas Transmission Co. v State of New York, 27 NY2d 608; Tilden Constr. Corp. v State of New York, 30 AD2d 612, supra; Georg Serv. Corp. v Town of Summit, 28 AD2d 578; Reuter v Town of Babylon, 40 AD2d 710, supra; Rason Asphault v Town of Oyster Bay, 8 Misc 2d 411, mod. on other grounds 6 AD2d 810; Queensboro Farm Prods. v State of New York, 175 Misc 574, affd 262 App Div 426, affd 287 NY 797; cf. Edlux Constr. Corp. v State of New York, 277 NY 635, affg 252 App Div 373).
As these cases also establish, a claimant’s cause of action does not accrue until it possesses the legal right to be paid and to enforce its right to payment in court. It follows that where, by contract or by statute, the State’s obligation to pay is conditioned upon an audit, no suit can be brought by a claimant until the official charged with making the audit has done so and has formally rejected all or some part of the claim. Moreover, where the audit is to be performed by a particular official, here the State Comptroller, neither an opinion of the Attorney-General nor a rejection by some other branch of the State government triggers the running of the statutory period within which to initiate litigation (see Reuter v Town of Babylon, supra; Terry Contr. v State of New York, 27 AD2d 499, supra; Tilden Constr. Corp. v State of New York, 30 AD2d 612, supra).
The issue then narrows to whether, on all of the facts here, the city nevertheless should at some point have considered its claims to have been constructively rejected by the State, especially since it is obvious that, if constructive rejection were not available, the State could cast the city’s claims into legal limbo forever, for, without an audit, it could neither be paid nor bring suit. The city, in sending a letter to the State Comptroller setting a 60-day limit beyond which it would consider the claims rejected, utilized a procedure that is not unique. Our courts have noted it with approval in impasse situations not unlike this one (see Rason Asphault v Town of Oyster Bay, 8 Misc 2d 411, mod 6 AD2d 810, supra; Georg Serv. Corp. v Town of Summit, 28 AD2d 578, supra). If the *669 letter was timely, then its 60-day period may have supplied a point beyond which the six months specified in subdivision 4 of section 10 of the Court of Claims Act applied to these claims. The question, however, is whether the city was justified in waiting until November of 1966 to send such a letter.
In our view, it cannot be said as a matter of law that the city’s failure to regard its claims as rejected earlier than it did was not justified by the facts surrounding its negotiations with the State. The claims had then never been categorically rejected by the State. We do not treat here with a formal Statute of Limitations or, as the State conceded on argument, with estoppel, but with what is essentially a defense of waiver, the burden of proving which was on the State, the party which asserts it. "A waiver is 'the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it’ ” (Werking v Amity Estates, 2 NY2d 43, 52, citing Whitney, Contracts [4th ed, 1946], p 273). There is nothing more indisputable in this case than that the city, far from intending to "relinquish” its rights, never ceased to press for them.
From the time of the parties’ initial conference an attitude that the interest issue was negotiable rather than statutory permeated the atmosphere. Letters and memoranda suggesting further conferences reinforce this impression. The Department of Public Works’ suggestion that separate vouchers be utilized hardly comports with the idea that it regarded its own opinions as dispositive and surely does not prove that the city so regarded them. And it cannot be lost on us that the two parties were the State itself and the local governmental unit in which close to half its taxpayers reside. From that perspective, the city’s legislative efforts must be viewed as a natural and even perhaps an expected path for the parties to follow in the direction of conciliation, rather than as a waiver of judicial rights. The disputed existence of an oral agreement dehors the statutes, then a disagreement which was never resolved and which was treated by the parties as on-going and capable of nonjudicial resolution, also argue strongly that the city acted properly in basing its conduct on the supposition that something could be worked out short of a lawsuit. And, certainly, the fact that a party whose right to enforce a claim against another is dependent on an act of rejection by that other party may eventually treat such long-continued inaction as equivalent to rejection does not mean that the party guilty *670 of the inaction is equally free to take advantage of its own equivocation so as to bar the claim.
When justified by circumstances, our courts have countenanced even greater delays than the one involved here. In Georg Serv. Corp. v Town of Summit (28 AD2d 578, supra) a contractor’s delay of six years between completion of the work and bringing of an action for payment of a claim for extras which the town board of auditors had either refused or neglected to audit was held no bar to suit because negotiations between the parties and the conduct of the town indicated that the contractor had reasonably pursued less litigious means of resolving his difficulties first. And, in a related framework, our court has held that when officials provide mixed clues rather than the clear and formal statements required by statute: "The burden [is] put on a public body to make it clear what was or was not its determination. In dealing with this dilatory defense the courts should resolve any ambiguity created by the public body against it in order to reach a determination on the merits and not deny a party his day in court.” (Matter of Castaways Motel v Schuyler, 24 NY2d 120, 126-127.)
In the Castaways case, as here, the State rested a claim of untimeliness on the ground that the claimant’s cause of action had accrued upon his receipt of informal notice that a difficulty existed with respect to an award of the relief he sought administratively. That case involved suit between the State and a private party. If the burden is on the State to make its determinations clear and formally correct within the meaning of applicable statutes vis-á-vis a private party, there is no reason why it should bear a lesser burden when the city is the claimant. Both of these powerful public entities with their mutual need to co-operate on a host of fronts, financial and otherwise, should be expected to act with far more motivation to avoid litigation whenever possible.
Given all of these facts, the Court of Claims’ dismissal for untimeliness, based as it was on its opinion that a failure to audit within two months after the submission of the vouchers was the equivalent of rejection, was unrealistic and cannot be permitted to stand. Accordingly, in Claim No. 52436, where timeliness was found by the Court of Claims, the order of the Appellate Division should be reversed and that of the Court of Claims reinstated, and, in Claim No. 47847, the order appealed from should be modified by reversing so much of it as *671 granted summary judgment to the State on its motion to dismiss the city’s claims and should otherwise be affirmed and the case should be remitted to the Court of Claims for further proceedings in accordance with the views expressed in this opinion.

. Because the "estimate” limitation on the city’s right to reimbursement had led to complaints of unwarranted substantive imposition on it where condemnation awards had been fixed by the courts, the statute was later amended to allow reimbursement to the city of its full 50% of actual costs except where the property was acquired by purchase (L 1954, ch 701).

. The dissenting opinion’s reliance on New York State Thruway Auth. v Hurd (25 NY2d 150) is misplaced. That case did not hold that the word "interest” must appear in a statute in order to authorize its payment; rather, it held that there is no presumption that interest was intended without at least an implicit manifestation of legislative intent to include interest payments within those covered by the statute. It therefore begs the question in the present case. Moreover, the Hurd decision was based in large part on specific language in the statute there involved to the effect that the State Comptroller could receive back from the authority only an amount "equal to” the amount it had originally loaned to that agency. In contrast, the statute now before us, section 340-b, requires that the city be reimbursed "in full” for all of the "costs and expenses” incurred by it in achieving these interstate appropriations. Interestingly, Public Law 627, Chapter 462 (Federal-Aid Highway Act of 1956), the ultimate source of 90% of the funds out of which these payments are to be made, speaks of the “costs” to be reimbursed as "total”. In the light of the history and purpose of section 340-b, it seems clear that the Legislature’s intent, in specifying that the city shall, in interstate cases involving such Federal funds, be reimbursed “in full” was broad enough to cover reimbursement of the interest expenditures made by the city (see, also, Woerz v Schumacher, 161 NY 530).

. By chapter 1052 of the Laws of 1968 an interest limitation of two years in length was substituted in subdivision 3.3 of section 349-c.