In the Matter of COLUMBUS PARK CORPORATION, Appellant, v DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT OF THE CITY OF NEW YORK et al., Respondents.

First Department, August 22, 1991

APPEARANCES OF COUNSEL

*Marvin Wexler* of counsel *(Concettina Sacheli* with him on the brief; *Kornstein Veisz & Wexler,* attorneys), for appellant.

*William J. Thom* of counsel *(Stephen J. McGrath* and *Andrea Roschelle* with him on the brief; *Victor A. Kovner, Corporation Counsel,* attorney), for respondents.

**OPINION OF THE COURT**

WALLACH, J.

■ This CPLR article 78 proceeding in the nature of mandamus is brought by a Mitchell-Lama limited-profit housing company organized in 1963, and seeks to compel respondent City of New York and its agency in charge of supervising city-sponsored Mitchell-Lama housing, respondent Department of Housing Preservation and Development, to issue a letter of no objection, an administrative permit necessary to clear the way for petitioner's dissolution as a Mitchell-Lama company and conversion to a private housing cooperative not subject to the Mitchell-Lama Law (Private Housing Finance Law art II). Dismissing the petition, Supreme Court, although critical of respondents' "laggard approach" and "extreme delay" in their

assertion of objections to dissolution, sustained the position belatedly adopted by respondents that certain covenants contained in the original deed to petitioner created a contractual duty to maintain its public status as Mitchell-Lama housing for an additional 20-year period (149 Misc 2d 66), thus depriving petitioner of access to the benefits created by the Private Housing Finance Law. We disagree, reverse the order appealed from, and grant the petition.

Petitioner's case is based on Private Housing Finance Law § 35 (2). Enacted in 1960, this statute entitles a Mitchell-Lama company that obtained its loan after May 1, 1959, such as petitioner, to withdraw from the Mitchell-Lama program after 20 years without the consent of the city, upon payment of the remaining balance of its mortgage. To be compared is the immediately preceding subdivision (§ 35 [1]), applicable to Mitchell-Lama companies that obtained loans prior to May 1, 1959, which allows withdrawal from the program only after 35 years and then only with the consent of the city. Clearly, the purpose of section 35 (2) was to make participation in the program more attractive to private developers by a reduction of the minimum period of participation in the program and an acceleration of the time for relief from municipal constraints *(see, 2550 Olinville Ave. v Crotty,* 149 Misc 2d 806, 811-812).

Given a statutory provision that explicitly denies the city the authority to prohibit petitioner's dissolution as a Mitchell-Lama company after 20 years, it is revealing that the city's brief mentions this decisive legislation only once, and then only in a footnote that does no more than acknowledge its existence. The city's case is built upon certain stipulations agreed to by petitioner in the parties' contract, the land disposition agreement (LDA), which were incorporated into the deed as covenants "running with the land"; these covenants, the city argues without reference to section 35 (2), prohibit petitioner's dissolution as a Mitchell-Lama company for at least 40 years. The city's argument appears to be that the covenants constituted an implied, but nonetheless legally cognizable waiver by petitioner of its statutory right to withdraw from the program after 20 years. We do not agree that the covenants on which the city relies can be read to establish such a waiver.

The covenants require petitioner and its successors and assigns, for a period of 40 years, to "devote such land to the uses specified in the Urban Renewal and Project Plans"; prohibit such land from "be[ing] used for any use other than

the uses specified therefor in the Urban Renewal and Project Plans * * * or contrary to any limitations or requirements of said Plans"; and prohibit any "change[s]" in the housing project "as set forth in the Urban Renewal and Project Plans * * * without the consent of the City Planning Commission and the Board of Estimate". The terms "uses specified in the Urban Renewal Plan" and "land use" are defined to "include the land and all building, housing, and other requirements or restrictions of the Urban Renewal Plan pertaining to such land."

It is immediately apparent that while the meaning of the covenants must be drawn from the urban renewal and project plans, no references to any specific sections of either Plan are to be found in the covenants. This compels the city to undertake what is, in effect, a word search of the urban renewal and project plans for the term "land use" or the word "uses". Its scan ends up by isolating a sentence of the urban renewal plan requiring that the land purchased by petitioner, designated as Parcel 16, "be used for tax-abated housing at moderate rentals or carrying charges", in contradistinction to other residential parcels that were to be "used for public housing" or "used for full tax-paying housing". In addition, the sentence on which the city focuses refers to Map 3, the "Redevelopment Areas Land Use Map", depicting all of the parcels in the West Side Urban Renewal Area, and describing them as either "Public Housing", "Tax-Abated Housing at Moderate Rentals or Carrying Charges", "Full Tax-Paying Housing", "Commercial", "Public" or "Semi-Public".

Petitioner reads the covenants to mean a 40-year commitment only to maintain the multifamily residential character of the building, and to make no changes in the building's physical characteristics without the consent of the City Planning Commission or Board of Estimate. Thus, petitioner points out that the urban renewal plan was amended in 1979 to delete the word "used" in the sentence relied on by the city, and to substitute therefor the word "developed", this to make clear that the land was to be developed as middle-income housing, and "used for multi-family residential purposes", as the urban renewal plan elsewhere states, in contradistinction to the other "use" categories described in the plan—retail-commercial, general office and banking, public and semipublic. Petitioner's reading accords with experience. It is quite common for deeds in development tracts to contain covenants prohibiting building alterations and restricting the various

parcels that comprise the tract to particular, especially residential, uses *(see generally,* 43 NY Jur 2d, Deeds, §§ 151-223). On the other hand, it is, at best, unconventional to argue, as the city does, that a covenant running with the land was meant to restrict ownership only to persons fitting a particular socioeconomic profile. Indeed, it is doubtful whether a private agreement, as opposed to a statute, imposing such a restriction, would be enforceable *(see Shelley v Kraemer,* 334 US 1; *Barrows v Jackson,* 346 US 249). Be that as it may, here a statute does exist restricting ownership to persons of middle-income status, but for a term of only 20 years, not 40 years as urged by the city.

The urban renewal plan was a comprehensive plan of land development and improvement for a 20-block area of the Upper West Side of Manhattan. It was part of this Plan to develop Parcel 16 as a middle-income, multifamily residence, but there is simply no evidence that it was the planners' overall conception to freeze the socioeconomic make-up of the West Side for 40 years. It is not as if every parcel comprising the renewal area contained similar 40-year covenants. Nor is it as if petitioner received any specific benefit or consideration in exchange for relinquishing its right to withdraw from the program after 20 years.

It is well settled that the policy of the law is to favor the free and unobstructed use of realty, and that covenants restricting the use of property are strictly construed against those seeking to enforce them; furthermore the required level of proof for enforcement is the clear and convincing, as opposed to a mere preponderance, standard *(Huggins v Castle Estates,* 36 NY2d 427, 430). Moreover, a waiver, by definition, is the intentional relinquishment of a known right—it must be clear, unequivocal and deliberate *(City of New York v State of New York,* 40 NY2d 659, 669; *Matter of Civil Serv. Employees Assn. v Newman,* 88 AD2d 685-686, *affd* 61 NY2d 1001). The covenants here, drafted by the city, and subject to the familiar construction rule of *contra proferentem,* must be characterized as something less than clear, what with their blanket incorporation of the urban renewal and project plans without specific crossreferences, and their nonlimiting definitions of the terms "uses specified in the Urban Renewal Plan" and "land use". This is not to suggest that the only way to have effected a waiver of the time limitation set forth in Private Housing Finance Law § 35 (2) would have been to state specifically that it was being waived; but surely, had the

parties intended a change from the statutory scheme as significant as that urged by the city, language more explicitly indicating that petitioner was to remain in the Mitchell-Lama program for 40 years would have been used. "[W]here the language used in a restrictive covenant is equally capable of two interpretations, the less restrictive interpretation must be adopted" *(Sunrise Plaza Assocs. v International Summit Equities Corp.,* 152 AD2d 561). All of the references to the Mitchell-Lama Law found in the LDA, and there are many, do not in any manner limit the applicability of that law, and thus can only be read to acknowledge and incorporate the part of it which gives petitioner the right to dissolve after 20 years.

Two other circumstances point to the conclusion that petitioner did not waive its statutory right to withdraw from the Mitchell-Lama program after 20 years. First, petitioner's exemption from municipal real estate taxes was originally approved for a period of no longer than 30 years, after which there would have been no incentive for it to remain a Mitchell-Lama company. While it is true that in 1978 petitioner's tax exemption was extended to a maximum of 50 years, that circumstance could hardly affect the meaning of the covenant language as the parties understood it 14 years earlier when the LDA was signed. Petitioner also points out that under 42 USC § 1452 (a), the maximum period of time that its mortgage could be outstanding was 40 years; thus, petitioner appropriately urges that the 40-year period was included in the LDA not to conform with the over-all land development scheme laid out in the urban renewal plan, but rather "to conform with the Capital Grant Contract and for the purpose of ensuring the repayment of the borrowed moneys."

Second, respondents at first endorsed petitioner's proposed conversion to private ownership, and did not change their position until very late in the process, virtually "on the brink of closing", the "thirteenth hour", as petitioner puts it. This long period of acquiescence, during which petitioner busily prepared its red herring and offering plan, obtained a bank commitment, and secured the support and votes of 92% of the owner occupants (nonpurchasers are to be covered by the Rent Stabilization Law), itself renders respondents' expansive reading of the covenants suspect.

Finally, we would suggest that the city's speculations as to the windfall profits which may accrue to petitioner's benefit if its petition is granted are of little or no relevance to the merits of the controversy. For example, the reference to the

$405,000 value of the two highest priced apartments in petitioner's "red herring" (uncritically adopted by the dissent) bears no relation to present realities. That valuation is expressly dependent upon the qualification of the new condominium corporation under section 216 of the Internal Revenue Code (26 USC). It is undisputed that currently such qualification is unavailable, inasmuch as more than 20% of the condo's income will be derived from nonshareholder sources such as commercial rents. Accordingly, the purchase price (and presumed value) of these two apartments in the table, applicable under these circumstances (where the shareholders do not qualify for the usual cooperative maintenance tax deductions), is under $200,000.

Furthermore, a feature of this plan of dissolution includes the right of any present shareholder in the Mitchell-Lama corporation to a statutory appraisal of his shares under the Business Corporation Law (§ 623). If real estate market conditions do present a windfall opportunity, it may eventuate that this will accrue to individual apartment tenants now in place. It may also be worth noting that this plan also includes a high flip tax, obviously to discourage profiteering.

Accordingly, the order and judgment (one paper) of Supreme Court, New York County (Bruce McM. Wright, J.), entered on December 12, 1990, which dismissed the petition, is reversed, on the law, and the petition granted, without costs.

Ross, J. (dissenting). I would affirm the order and judgment (one paper), entered December 12, 1990, of the motion court, dismissing the petition (149 Misc 2d 66).

Pursuant to General Municipal Law former § 72-m, and title I of the Housing Act of 1949 (63 US Stat 413), as amended, in April 1962, the New York City Housing and Redevelopment Board (HRB) proposed a final urban renewal plan for an Urban Project, designated as the West Side Urban Renewal Area, located in a 20-block neighborhood, bounded by West 97th Street, Central Park West, West 87th Street and Amsterdam Avenue, Borough of Manhattan, New York County. Thereafter, as a result of a number of public hearings, attended by, among others, "representatives of City-wide and neighborhood community organizations, political clubs, tenant groups, City, State and Federal Legislators and residents of the area, the [Urban Renewal] Plan was approved by the City Planning Commission on May 29, 1962 * * * [and] the Board of Estimate on June 26, 1962" (see, Appendix on Appeal).

It is evident that the concept of the urban renewal plan was to produce an urban neighborhood, with a healthy mixture of persons of widely disparate incomes and ethnic backgrounds. Therefore, "[t]he new housing to be developed on sites previously occupied by substandard buildings was to provide the community with 7,800 new apartments as follows: 800 low-income public housing units, 4,200 middle income units, 15% of which were to be made available at rents comparable to public housing, and 2,800 market rate, privately financed units" (see, Appendix on Appeal). In order to achieve that objective, "the Land-Use provisions of the Plan provided a parcel by parcel distribution of housing by specific income categories" (see, Appendix on Appeal). More than 50% of the 38 parcels, or 20, were reserved for "tax-abated housing at moderate rentals or carrying charges" (see, Appendix on Appeal). One such parcel is Parcel No. 16, where Columbus Park Apartments (Apartments), a City-regulated, middle-income, cooperative housing development, is located on the West Side of Columbus Avenue, between 93rd and 94th Streets, New York County.

Columbus Park Corp. (Columbus) is a limited-profit housing company, organized pursuant to article II of the Private Housing Finance Law, popularly known as the Mitchell-Lama Law, for the purpose of undertaking the development of Parcel No. 16, "on a non-profit basis" (see, Appendix on Appeal).

According to New York State Senator MacNeil Mitchell, who sponsored the legislation, resulting in the Private Housing Finance Law, the principal purpose is to provide governmental assistance, in various forms, such as mortgage loans, aid in land assembly or site acquisition, or tax abatement for a limited period, to solve "the shortage of moderate income housing for families whose earnings exceed the traditional public housing level * * * Today, a number of influences have combined to make entry into the middle income field by private enterprise difficult without some form of public aid" (see, Mitchell, Foreword to McKinney's Cons Laws of NY, Book 41, Private Housing Finance Law at VII, [1962 ed]).

It is undisputed that the City of New York (City) sold Parcel No. 16 to Columbus, at a small fraction of its market value, so that Columbus would be able to develop that site for limited-profit middle-income housing. Columbus financed the purchase of Parcel No. 16, as a result of the Board of Estimate's (BOE) approval, on March 19, 1964, after a public hearing, of a 50-

year, low-interest City-aided mortgage loan of $3,294,000 or 90% of the actual cost of the Apartments, whichever was less (see, Private Housing Finance Law § 23 [1]), and for a 50% exemption of the real property from local and municipal taxes (see, Private Housing Finance Law § 33 [1]) for up to 30 years.

When Columbus was developing Parcel No. 16 into the Apartments, Columbus was made up of "a group of citizens living on the upper west side concerned with the critical need for additional moderately priced housing accommodation * * * The maximum average rentals to be charged in [the Apartments] will not exceed $27.50 per rental room per month (excluding utilities), and the equity capital requirements will not exceed $600 per rental room" (see, Appendix on Appeal).

As a quid pro quo for receiving the generous financing package approved by the BOE, Columbus had to limit its profit (see, Private Housing Finance Law § 28 [1]), and subject itself to HRB regulation of the purchase price and carrying charges of each apartment (see, Private Housing Finance Law § 31 [1] [a]). For example, HRB regulations only permitted persons to qualify for co-op ownership in Apartments, whose incomes did not exceed specified levels, and limited the amount of profit tenant shareholders could make on the resale of their units, and therefore the benefit of a low co-op purchase price, provided by the governmental assistance, discussed supra, would be passed on to successor occupants.

After a review of the record, it is clear that, in order to induce the City to sell Parcel No. 16 and to extend financial assistance to develop said Parcel, Columbus agreed to several covenants. The land disposition agreement (LDA), dated March 19, 1964, incorporating the urban renewal plan and a project plan summary, and the deed, dated July 29, 1965, both executed by Columbus and the City, contain the subject covenants. Those covenants preclude Columbus, as well as its successors and assigns, for a period of 40 years, without the consent of the City Planning Commission and the BOE, from using the land herein for any purpose other than limited-profit, middle-income, subsidized, government regulated housing (see, LDA § 505 [a], [b], [c], and Deed, ¶ 5 [a], [b], [c], found in the Appendix on Appeal).

Private Housing Finance Law § 35 (2) permits a limited-profit housing company, such as Columbus, after the passage of 20 years from the date of occupancy, which in Columbus' case was 1967, to voluntarily dissolve, without the consent of

any supervising agency, "upon the payment in full of the remaining balance of principal and interest due and unpaid upon the mortgage or mortgages".

Relying on the statutory provision, *supra,* in March 1989, Columbus filed a notice of intent to dissolve with the Department of Housing Preservation and Development of the City of New York (HPD), which, as the successor to the HRB, administers the limited-profit middle-income housing program. At the time of that filing, Apartments had been occupied for more than 20 years, and Columbus desired to prepay its mortgage indebtedness, so that it could dissolve, in order that Apartments, instead of being operated as government regulated middle-income housing, would thereafter be operated, by a newly created private cooperative housing corporation, as market rate housing.

Although, initially, representatives of HPD expressed the belief that Columbus' dissolution application appeared to be in order, further review by those representatives made it clear that Columbus' proposed conduct might be violative of the intent of the 1962 urban renewal plan, discussed *supra,* to provide affordable middle-income housing.

By letter to Columbus, dated April 30, 1990, an Assistant Commissioner of HPD stated, in pertinent part, that the City would not issue a letter of no objection to Columbus' application to dissolve, since:

"HPD has reviewed, among other things, the Land Disposition Agreement with the City and the Deed from the City for the above mentioned project [Apartments]. We have concluded that the Urban Renewal Plan and the Plan and Project approved for the Mitchell-Lama housing company, both of which are incorporated in the Deed and Land Disposition Agreement and made effective for a forty (40) year period, preclude the conversion of the above mentioned project from a middle income, subsidized cooperative to a market rate, unsubsidized cooperative until the expiration of the aforementioned forty (40) year period.

"A modification of the terms of the Plan and Project and the Urban Renewal Plan would require approval by the Board of Estimate or the City Council after the dissolution of the Board and could be subject to the Uniform Land Use Review Process contained in section 167-c of the City Charter".

In response, in May 1990, Columbus (petitioner) instituted a proceeding, pursuant to CPLR article 78, against the HPD and

the City to annul the determination of HPD and to compel HPD to issue a letter of no objection.

Following the joinder of issue, the IAS court dismissed the petition.

When construing contracts, "due consideration must be given to the purpose of the parties in making the contract * * * A fair and reasonable interpretation, consistent with that purpose, must guide the courts in enforcing the agreement" *(Matter of Cromwell Towers Redevelopment Co. v City of Yonkers,* 41 NY2d 1, 6 [1976]).

Applying this legal authority to the contractual documents, including the covenants, before this court, the fair and reasonable interpretation of them, consistent with the parties' course of conduct and purpose, indicates that the petitioner unequivocally committed itself to maintain Apartments, for 40 years, not simply for residential use, but rather for use as middle-income housing "at moderate rentals or carrying charges", in exchange for the City granting petitioner substantial financial assistance.

Further, by the knowing and intentional act of executing the LDA and deed, containing the covenants, the petitioner waived its statutory right to dissolve as a limited housing company after 20 years. It is long-established law that a party may waive a statutory right *(Selzer v Baker,* 295 NY 145, 149 [1946]; *Matter of City of New York v New York State Dept. of Envtl. Conservation,* 89 AD2d 274, 276 [1982]; 57 NY Jur 2d Estoppel, Ratification, and Waiver, §§ 78, 79).

The majority opinion states: "Nor is it as if petitioner received any specific benefit or consideration in exchange for relinquishing its right to withdraw from the program after 20 years" *(see,* majority opn, at 149). This completely ignores the fact that the petitioner received the title to the site at a small fraction of the market value and with a very generous financial package, including a low interest City-aided loan in excess of $3,000,000 and a 50% exemption of the real property from local and municipal taxes.

Further, the majority's adoption of petitioner's contention that the sole purpose for the 40-year term was to ensure repayment of the mortgage *(see,* majority opn, at 150), is not supported by the facts herein, and is refuted by the petitioner's own argument that they had a right to "buy out" of the Mitchell-Lama program after 20 years, which would require petitioner to satisfy the mortgage at that time.

Examination of petitioner's noneviction offering plan of voluntary dissolution and conversion clearly indicates that privatization and conversion to market rate value of the apartments, while retaining their "residential" character, will soon alter their "moderate rental" nature, will result in altering the income housing balance established for the 20-block West Side urban renewal plan, and destroy the sought after social objective of a healthy mixture of persons of widely disparate incomes and ethnic backgrounds.

It would be unfair and inappropriate to permit the huge profits to be gained by the plaintiffs for what was always planned and intended as a project for middle-income housing. To permit apartments which were purchased for approximately $600 per room to now be sold at an appraised value of up to $405,000 would make a mockery of the plan to have a well-integrated community, and eventually only people with high incomes could reside in the project.

Petitioner claims that, due to respondents' delay of more than a year before rejecting its application, which delay gave the petitioner the impression that respondents would not object, it expended thousands of dollars in furthering its objective to dissolve, and convert to market rate housing, and therefore respondents should be estopped from enforcing the covenants. There is no merit to that contention, since respondents acted in a governmental capacity to protect the middle-income housing concept of the West Side urban renewal area, and "[g]enerally, estoppel may not be invoked against a municipal agency to prevent it from discharging its statutory duties * * * and the factual setting presented on this appeal does not warrant an exception to this doctrine" *(Scruggs-Leftwich v Rivercross Tenants' Corp.,* 70 NY2d 849, 852 [1987]).

The judicial review provided by CPLR article 78 is a limited one, in view of the fact a court must confirm an administrative determination, when the administrator does not act in excess of his or her jurisdiction, or in violation of lawful procedure, or in abuse of his or her discretion, or arbitrarily *(see,* CPLR 7803 [3]; *Matter of Pell v Board of Educ.,* 34 NY2d 222, 230-232 [1974]).

Accordingly, based upon the record, discussed *supra,* I find that, since the determination of respondent HPD is rational, the order and judgment (one paper) of the motion court should be affirmed.

SULLIVAN, J. P., and SMITH, J., concur with WALLACH, J.; ELLERIN and ROSS, JJ., dissent in an opinion by ROSS, J.

Order and judgment (one paper), Supreme Court, New York County, entered on December 12, 1990, reversed, on the law, without costs, and the petition granted.