**BRENNTAG INTERNATIONAL CHEMICALS, INC.,**
Plaintiff,

v́.

**NORDDEUTSCHE LANDESBANK GZ and Bank of India, Defendants.**

No. 97 Civ. 2688(RWS).

United States District Court,
S.D. New York.

June 18, 1998.

Katten, Muchin & Zavis, Chicago, IL (James C. Murray, Jr., Deane B. Brown, of counsel), Howard, Darby & Levin, New York City (Linda C. Goldstein, of counsel), for Plaintiff.

McDermott, Will & Emery, New York City (Julie Y. Chen, Michael C. Nissim, of counsel), for Defendant Norddeutsche Landesbank GZ.

Sidley & Austin, New York City (James D. Arden, Rajiv Khanna, John J. Lavelle, of counsel), for Defendant Bank of India.

## OPINION

SWEET, District Judge.

Plaintiff Brenntag International Chemicals, Inc. ("Brenntag") has moved for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, to enjoin payment under Irrevocable Stand–By Letter of Credit No. 190397 in the amount of $2,452,167.43 (the "LOC"). The LOC, which was issued by Norddeutsche Landesbank, GZ ("Nord/LB") at Brenntag's request, was used to secure payment for a shipment of naphtha purchased by Brenntag from Petro Pharma PTE, Ltd. ("Petro Pharma"), a Sing-

apore entity now in receivership. Co-defendant the Bank of India ("BOI") has cross-moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, on the grounds that BOI is immune from the relief requested pursuant to the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602–1621. Finally, Brenntag has moved to strike or disregard as inadmissible certain supplemental affidavit testimony submitted by BOI. For the reasons set forth below, Brenntag's motion to strike or disregard the supplemental affidavit testimony is denied, Brenntag's motion for a preliminary injunction is granted, and BOI's motion for judgment on the pleadings is denied.

### Parties

Plaintiff Brenntag is a Texas corporation with its principal place of business in Houston, Texas.

Nord/LB is a foreign banking organization formed under the laws of German, its principal place of business is in Germany, and it has offices in New York, New York.

BOI is a foreign banking organization formed under the laws of India, with its principal place of business in India. BOI has banking offices in Singapore and New York, New York, among other places. BOI is an "agency or instrumentality" of India which carries on commercial business at its place of business in New York, as set forth in the FSIA.[1]

### Prior Proceedings

Brenntag filed the complaint in this action on April 16, 1997, and on that day moved by Order to Show Cause for a temporary restraint and a preliminary injunction. The Court granted the temporary restraint and required Brenntag to post a bond as security.

On May 22, 1997, this Court held a hearing on the preliminary injunction. At the end of the preliminary injunction hearing, the Court observed that the "issue of holder in due course and the knowledge and the relationship between Bank of India and Petro Pharma ... has not been completely explored."

The Court further stated that "[w]hat we are interested in is the relationships." Accordingly, the Court instructed the parties to engage in expedited discovery on these limited issues and to file submissions which clarify the outstanding issues articulated by the Court.

The parties filed additional submissions and the preliminary injunction hearing was continued on March 25, 1998.

### Facts

The parties here agree that the underlying business transaction giving rise to the instant dispute was a fraud. There is no dispute here that Petro Pharma, a Singapore corporation now in receivership, never shipped the chemicals to its customer, Brenntag, and yet represented to the BOI that it had. There is also no dispute that the BOI advanced to Petro Pharma approximately $2.4 million with the expectation that it would be repaid out of the proceeds from the purported sale.

The dispute here is whether, notwithstanding the underlying fraud perpetrated by Petro Pharma, the BOI is entitled to payment from Nord/LB pursuant to a stand-by letter of credit established by Brenntag to pay for the chemicals because, as the BOI contends, it validly negotiated for all of the documents required to be presented to Nord/LB for payment. The pertinent facts are set forth below in chronological order.

### I. May 1995: BOI Began Its Banking Relationship With Petro Pharma

BOI began its banking relationship with Petro Pharma in May 1995, when Petro Pharma was introduced to BOI through one of BOI's customers in the trading business, Parsram Brothers. Petro Pharma opened a current account with BOI and "did some trade finance transactions" through BOI as well. BOI's primary contacts at Petro Pharma were its directors, Mr. Narasimhan Ashok and Mrs. Rema Ashok ("Ashoks"), as well as Mr. B. Aranaprasad, also known as Prasad ("Prasad"), and Mr. Venkat Iyer ("Iyer").

---

**1.** It is undisputed here that under the FSIA, the definition of "foreign state" is broad enough to encompass purely commercial banks, such as BOI, "a majority of whose shares ... is owned by a foreign state." 28 U.S.C. § 1603(b)(2).

Prasad had previously been employed at BOI's Singapore Branch for four years as the Manager of Trade Finance (Export), where he dealt with letters of credit. Prasad's position as Manager of Trade Finance (Export) was subsequently combined with the position of Manager of Trade Finance (Import) to create the post of Manager of Trade Finance, a position assumed by Some Nath Banerjee ("Banerjee") on September 4, 1995. In this position, Banerjee managed all aspects of letters of credit, as well as other import and export trade finance matters. The parties dispute whether the term of employment for Prashad and Banerjee overlapped.

At the time Petro Pharma opened its account with BOI, the Ashoks signed a personal guarantee for the sum of Singapore $5 million, although BOI did not take any tangible securities to collateralize this guarantee. In addition, the Ashoks also signed a corporate guarantee, for indemnity against losses, as well as an indemnity against monies advanced on any bills or checks.

In order for BOI to determine which employees were authorized to act on behalf of Petro Pharma with respect to its BOI transactions, Petro Pharma provided BOI in May 1995, when the account was opened, with its Board Resolution naming the Ashoks and Prasad as authorized signatories for Petro Pharma. Petro Pharma also supplied BOI with an "authorized signatory" card, also known as a "face card," which contained sample signatures of the Ashoks and Prasad. BOI recognized that the "authorized signatories" were the only people that can sign on behalf of Petro Pharma. For verification purposes, BOI took copies of the passports of the authorized signatories at the time the account was opened. When the Petro Pharma account was opened, BOI kept all of these opening documents in its deposit section department.

On January 25, 1996, BOI received from Petro Pharma a copy of its new Board Resolution, passed on December 19, 1995, which changed the authorized signatories on Petro Pharma's account with BOI. The Board Resolution authorized either of the Ashoks to sign singly on behalf of Petro Pharma and authorized any two of the following individuals to sign jointly on behalf of Petro Pharma: Prasad, Iyer or Carter J. Ward. The Board Resolution provided sample signatures for all five signatories. BOI's notes on the new Board Resolution indicated that BOI was to "[t]ake out the old," "[n]ote these instructions," "obtain a face card for all," and "[f]or Carter J. Ward, obtain passport/IC."

On two occasions prior to the transaction at issue here, Brenntag purchased goods from Petro Pharma and opened stand-by letters of credit to pay for the goods. For each transaction, Petro Pharma requested that BOI "negotiate/discount" the letters of credit. BOI has not, however, established that Brenntag or Nord/LB knew that BOI had "negotiated" the documents for the stand-by letters of credit. In neither case did Nord/LB pay to BOI under the letters of credit. In fact, Brenntag paid the invoices under the two stand-by letters of credit directly. BOI's contention that Nord/LB should have been aware because it made a request to draw upon a letter of credit which it later withdrew is not credible.

## II. *March 1996: Brenntag Purchased Naphtha From Petro Pharma, Payment Of Which Was Secured By The LOCO*

On or about March 14, 1996, Brenntag entered into a contract with Reliance Industries Limited ("Reliance"), located in Bombay, India, in which Brenntag agreed to sell to Reliance 15,000 metric tons +/− 5 percent of naphtha. To procure the naphtha for Reliance, Brenntag entered into a contract with Petro Pharma on or about March 19, 1996, for 15,000 metric tons of naphtha, delivery to be made in Bombay, India to arrive April/May 1996. Under the contract, payment was to be secured by an irrevocable stand-by letter of credit.

On or about March 21, 1996, at Brenntag's request, Nord/LB issued the LOC in favor of Petro Pharma as beneficiary and BOI as the advising bank, in the amount of U.S. $2,340,-000 +/− 5%. The LOC was:

Payable at sight, but not earlier than 361 days after the loading date, at our counters, against presentation of the following documents:

1.  Copy of commercial invoice covering 15,000 metric tons plus/minus five percent of naphtha at a price of U.S. DLRS 158.00 per metric ton, CFR Bombay, India.

2.  Copy of negotiable bill of lading.

3.  Statement purportedly signed by an authorized representative of Petro Pharma Pte Ltd. Stating that: "payment, which was due 360 days after completion of loading, has not been received and is due from Brenntag International Chemicals, Inc."

4.  Copy of beneficiary's covering letter addressed to Norddeutsche Landesbank GZ, 1270 Avenue of the Americas, New York, New York, 10020 under cover of all original negotiable documents sent, via courier service, directly upon shipment.

Presentation of copies of Petro Pharma's covering letter along with the original negotiable documents were acceptable under the terms of the LOC, presumably because Nord/LB was already supposed to be in possession of the originals, directly upon shipment, as set forth in of the LOC.

The LOC also provided the following Special Conditions:

1.  Partial shipments/drawings are not acceptable.

2.  All charges other than those of the issuing bank are for the account of the beneficiary.

3.  Negotiation is restricted to the bank of India, Singapore.

Additionally, the LOC was made subject to the Uniform Customs and Practice for Documentary Credits (1993 Revision) Publication No. 500 of the International Chamber of Commerce, Paris, France (the "UCP").

The LOC was originally to expire on March 17, 1997. On March 22, 1996, the expiration date was amended to June 30, 1997. Additionally, on March 26, 1996, the unit price per metric ton of naphtha was amended to U.S. $156.00.

### III. *March 1996: BOI Advanced U.S. $2.4 Million To Petro Pharma Under The LOC*

On March 22, 1996, immediately after becoming the beneficiary under the LOC, Petro Pharma wrote to BOI Chief Executive Nayak ("Nayak"), requesting that BOI approve "discounting of its invoices under the LOC," as BOI had apparently done on two of its prior transactions with Brenntag in May 1995. Banerjee defined "discounting" of letters of credit to mean "giv[ing] finance against letter of credit." Banerjee used the term "negotiation" synonymously with discounting.

Nayak passed along Petro Pharma's request to Banerjee, who handled the discounting transaction at issue. Banerjee admitted that Petro Pharma was requesting that BOI discount a stand-by letter of credit, as opposed to a documentary letter of credit. According to Banerjee, a stand-by letter of credit is "theoretically" different from a documentary letter of credit because an "applicant's non-performance" is required to give rise to a claim under a stand-by letter of credit, whereas a beneficiary need only "perform certain things, like submission of documents," under a documentary letter of credit.

Petro Pharma's March 22 letter states that it is tendering to BOI "documents as called for under the LOC ... along with an undated claim letter form for the purposes of completing your records." The "undated claim letter," also known as the "Default Letter," was signed jointly by Prasad and Iyer, on behalf of Petro Pharma. At his deposition, Banerjee conceded a number of points with respect to the Default Letter:

1.  At the time BOI received the Default Letter in March 1996, the stamp that now appears on the document—March 14, 1997—was not there.

2.  The Default Letter could not have been dated until after the due date (360 days after completion of loading).

3.  Brenntag had not defaulted on any obligations it allegedly owed to Petro Pharma in March 1996.

4.  On March 14, 1997, Banerjee instructed BOI's billing clerk to stamp the March

14, 1997 date on the Default Letter, even though nothing in the documents BOI received from Petro Pharma authorized BOI to date stamp the Default Letter.

5. BOI never asked or even attempted to ask anyone at Petro Pharma whether BOI was authorized to affix the March 14, 1997 date on the Default Letter.

6. At the time Banerjee examined the Default Letter in March 1996, and authorized payment by BOI to Petro Pharma of $2.4 million, the statement contained in the Default Letter—that "payment which was due 360 days after completion of loading has not been received and is due and owing from Brenntag International Chemicals, Inc."—as not true and could not have been true.

In addition to the undated Default Letter provided by Petro Pharma along with its March 22 letter to BOI, Petro Pharma provided BOI with the following documents which BOI reviewed in order to determine whether to discount the LOC:

1. The LOC;

2. A copy of Petro Pharma's covering letter dated March 22, 1996, the original of which was supposedly sent by DHL courier to Nord/LB. Brenntag contends that Nord/LB never received the original of this document or the original negotiable documents;

3. The purported bill of lading; and

4. Petro Pharma's invoice for naphtha bearing the incorrect unit price of $158 per metric ton.

In addition, when deciding whether to discount the LOC, BOI had in its possession a March 25, 1996 telex from Nord/LB to BOI stating that: (1) no payment has been made as of that date by Nord/LB directly to Petro Pharma outside the LOC; and (2) all payments under the LOC will be made only to BOI by Nord/LB.

Banerjee admitted that at the time BOI was determining whether to advance the funds under the LOC, BOI may not yet have received the March 26, 1996 telex from Nord/LB amending the LOC to reflect the unit price per metric ton of naphtha of $156, although BOI ultimately received this telex.

BOI had requested that Petro Pharma ask Nord/LB to issue this amendment addressing the unit price after BOI realized that the "unit price when multiplied by this tonnage was more than the LC value," which was an "inconsistency." BOI further conceded that when it decided to advance funds under the LOC, it had not yet received a copy of the letter dated March 28, 1996 from Petro Pharma to Nord/LB enclosing the revised Petro Pharma invoice bearing the correct unit price per metric ton of naphtha of $156. Thus, the documents against which BOI "advanced" $2.4 million to Petro Pharma were facially non-compliant with the terms of the LOC.

BOI also obtained a letter of indemnity from Petro Pharma so that it "may have recourse against [its] customer or beneficiary." Further, on March 26, 1996, Petro Pharma completed BOI's "standard application" for the negotiation of documents. The Application was jointly signed by Prasad and Iyer on behalf of Petro Pharma, both of whose signatures were verified by Banerjee.

Upon receipt of all of the aforementioned documents, BOI officials checked the documents, all of which were then given to Banerjee to review one more time. During the course of his review, however, Banerjes admitted that BOI did not make any inquiries to determine whether Nord/LB had received Petro Pharma's original covering letter with all original negotiable documents, supposedly sent to Nord/LB by DHL courier upon shipment. Nor did BOI make any inquiries to see whether the original negotiable documents had been accepted by Nord/LB, or whether Nord/LB or Petro Pharma had the DHL courier receipt.

Banerjee recommended to Nayak that "everything was in order," and that BOI should discount the LOC.

Once BOI approved Petro Pharma's request to advance approximately $2.4 million under the LOC, Petro Pharma furnished it with instructions to make payment of U.S. $1,810,000 to its account at Standard Chartered Bank, with the balance to be credited to its account with BOI. On March 26, 1996, BOI disbursed the funds according to Petro Pharma's request. BOI took up front its

interest and charges for discounting the LOC.

After BOI advanced the $2.4 million to Petro Pharma, it did not take an assignment of proceeds from the naphtha contract from Petro Pharma, nor did it take any collateral from Petro Pharma before disbursing the funds under the LOC. Likewise, Petro Pharma did not sign any promissory notes in connection with the $2.4 million financing under the LOC, and BOI has no lien on any of Petro Pharma's assets to secure the funds advanced under the LOC.

## IV. June 1996: Brenntag's Contract With Petro Pharma Was Cancelled Due To Non–Delivery Of Naphtha

On June 22, 1996, Reliance advised Brenntag that it was cancelling the naphtha contract because Brenntag had failed to deliver the naphtha as per the terms and conditions of the contract. Likewise, on June 22, 1996, Brenntag advised Petro Pharma that the naphtha contract had been cancelled by Reliance due to non-delivery of the naphtha, and accordingly, Brenntag was cancelling its naphtha contract with Petro Pharma. It is undisputed that the naphtha was never shipped, and Banerjee testified that BOI did not investigate this issue. Banerjee testified that BOI first learned about the contract cancellation when it heard from lawyers for Brenntag and Nord/LB during this litigation.

Although Brenntag advised Petro Pharma that their naphtha contract was cancelled, Brenntag contends that by oversight they did not take steps to cancel the LOC until March 13, 1997. BOI, on the other hand, cites Banerjee's testimony to support a contention that the claimed "oversight" was in fact intentional.

On March 13, 1997, Brenntag sent Nord/LB a facsimile requesting cancellation of the LOC, due to non-shipment and cancellation of the purchase contract.

## V. July 1996: Prasad Resigned From Petro Pharma And Was Replaced By Gandarvakottai Raghavan As Petro Pharma's Authorized Co–Signatory On The BOI Account

According to the sworn Declaration of Gandarvakottai Raghavan, dated June 26, 1997, Petro Pharma's former Business Manager, Prasad resigned from Petro Pharma to join another Singapore trading company known as Vinmar International Ltd. Because Prasad had been an authorized co-signatory on Petro Pharma's BOI account, as well as on Petro Pharma's other bank accounts, Ashok sent out a letter dated July 1, 1996, advising that Prasad no longer worked for Petro Pharma and was no longer authorized to represent Petro Pharma as of June 30, 1996. Although Banerjee denied that BOI received this letter and further denied knowing that Prasad had left Petro Pharma, he conceded that he "did not recall" having any dealings with Prasad after July 1, 1996. Banerjee further testified that he did not remember seeing any documents that were signed by Prasad on behalf of Petro Pharma after July 1, 1996, and if any such documents existed, BOI would have produced them. BOI did not produce any such documents.

According to Raghavan, when Prasad resigned from Petro Pharma, Raghavan was appointed to replace him as authorized co-signatory by virtue of a Board Resolution passed by Petro Pharma management. In order to replace Prasad as authorized co-signatory, Raghavan met personally with two BOI officials—Banerjee and Mr. Sethuraman—and provided them with the new Board Resolution appointing him as authorized co-signatory, along with Iyer. The Board Resolution clearly stated that it superseded the authorized signatories appointed in the earlier Board Resolutions.

BOI disputes that Raghavan provided Banerjee and Sethuraman with the Board Resolution, citing Banerjee's testimony, who disclaimed ever receiving the resolution, and stated that he was never authorized to accept board resolutions or signature cards, which he claimed is a manager function.

Raghavan also provided Banerjee with a copy of his passport for identification and then signed a specimen or "face" card so that his signature would be on file with BOI. Banerjee confirmed that it was BOI's practice to obtain sample signatures and copies of passports for new authorized signatories.

Banerjee denied that he ever met with Raghavan in July 1996 and further denied that Raghavan provided him with the new Petro Pharma Board Resolution changing its authorized signatories. BOI did not produce the Petro Pharma Board Resolution changing its authorized signatories, the face card with Raghavan's signature, or a copy of Raghavan's passport.

BOI accepted Raghavan as an authorized co-signatory on behalf of Petro Pharma on several documents produced by BOI, dated July 8, 1996 and August 15, 1996. Indeed, Banerjee readily identified Raghavan's signature on these documents, along with Iyer's, and admitted that he had previously seen Raghavan's signature. He further conceded that BOI had in fact accepted Raghavan as authorized co-signatory on the documents at issue.

### VI. *August–October 1996: BOI First Experienced Difficulties With Petro Pharma's Account And Began To make Inquiries of Nord/LB Regarding The LOC*

In August 1996, BOI first experienced problems with Petro Pharma's account. BOI had advanced U.S. $728,000 to Petro Pharma on a bill with a due date in July or August 1996. When the bill was not paid by the drawee—a customer in Dubai—BOI sought payment from the drawer, Petro Pharma. After informing Nayak of the overdue bill, Banerjee contacted Ashok to tell him "forcibly that [Petro Pharma] must return the funds immediately." Because $728,000 was considered a "large amount of money," Banerjee had multiple conversations with Ashok in pursuit of repayment. In fact, Banerjee admitted that "every day I used to chase him." Ashok ultimately repaid BOI the entire outstanding sum by October 1996.

Also during the September–October 1996 time period, Petro Pharma was attempting to raise money by selling an equity interest in the company to a Singapore entity known as Kewalram. Because BOI was to receive the money from this sale, Raghavan and Ashok wrote letters to Banerjee and Nayak regarding this transaction. Raghavan also stated that BOI knew of Petro Pharma's deteriorating financial condition from participation by Banerjee or Nayak in informal monthly meetings with the other Indian banks operating in Singapore, at which the finances and business dealings of their customers, including Petro Pharma, were discussed. Banerjee admitted that there is a forum for Indian banks in Singapore that meets monthly, but that he personally does not participate in that forum.

Once BOI began to experience problems with Petro Pharma in August 1996, it checked other accounts Petro Pharma maintained with BOI, including the balance owed to BOI under the previously discounted Stand–By Letter of Credit. Consequently, on August 28, 1996, BOI sent Nord/LB a facsimile requesting that Nord/LB "acknowledge receipt of documents submitted by the beneficiary directly to you as per terms of LC."

On September 3, 1996, Nord/LB responded to BOI's facsimile, with a telex stating that "[d]ocuments have not yet been received. For good order sake we would like to point out that negotiation is restricted to the Bank of India Singapore." Banerjee testified that BOI found this message "somewhat confusing" and claimed that Nord/LB had not "replied clearly" to what BOI had asked. Banerjee admitted that Nord/LB had advised BOI in its telex that the original documents had not been received by Nord/LB, as required by the LOC. BOI asserts that the telexes were deliberately confusing and that Brenntag alone had knowledge of the alleged contract cancellation but did not reveal that evidence, and in fact, went to great lengths to make sure that BOI did not discover it.

After receiving Nord/LB's September 3rd telex, Banerjee called Ashok at Petro Pharma and requested "receipts or other proof" that Petro Pharma had actually sent the original documents to Nord/LB. Although Banerjee requested from Ashok such documentation three or four times over a 20 or 25–day period, Ashok never supplied BOI with the proof it requested. Ashok ultimately told Banerjee that "DHL receipts were not traceable," and that "DHL courier receipts are not available at [Petro Pharma's]

end." Banerjee did not contact Brenntag directly to determine whether it had received the documents that were forwarded to Nord/LB under Petro Pharma's cover letter to Nord/LB dated March 22, 1996.

BOI sent a facsimile to Nord/LB on September 24, 1996, in which it advised that "[d]ue date of bill is on 12/3/97 and we will present documents as per LC terms. Pls note to make payment to us on due date."

In response to BOI's September 24th facsimile, Nord/LB sent a telex to BOI on October 4, 1996, in which BOI stated that "the L/C expires on June 30, 1997 and can only be utilized against presentation of documents as outlined in our opening telex of March 21, 1996 plus amendments dated March 22, 1996 and March 26, 1996." At no time throughout the August–October communications between Nord/LB and BOI did Nord/LB ever receive Petro Pharma's original covering letter along with the original negotiable documents. After the October 4th telex, there was no further communication between BOI and Nord/LB regarding the LOC until March 17, 1997, when BOI presented documents to Nord/LB attempting to draw on the LOC.

### VII. *February–March 1997: BOI Was Aware Of Petro Pharma's Imminent Receivership*

On February 24, 1997, an advertisement was published in the Straits Times, a local paper read by BOI, announcing that a winding-up petition had been filed by Habib Bank against Petro Pharma and that a hearing on this petition was to take place on March 14, 1997. Banerjee admitted that he saw the notice of the winding-up petition shortly after it was published. Banerjee understood from this petition that a receiver could be appointed for Petro Pharma at a court hearing on March 14, 1997. Shortly after he saw the advertisement, in February 1997, Banerjee telephoned Habib Bank to find out why it had filed the petition. A Habib Bank official advised Banerjee that Petro Pharma owed it approximately $300,000. Banerjee advised Nayak of this information and was told by Nayak to contact Ashok about the petition.

According to Raghavan, on or about March 1, 1997, BOI became very concerned about Petro Pharma's ability to pay back moneys advanced by BOI under the LOC. As a result, from March 1–13, 1997, either Raghavan or Iyer engaged in daily conversations with Banerjee regarding Petro Pharma's financial condition and ability to repay BOI. Although most of these conversations occurred on the telephone, two of the discussions took place at Petro Pharma's office. Because Ashok was in Europe at this time, looking for prospective investors to help Petro Pharma, Raghavan reported these conversations to him on a daily basis. Also during these conversations in early March, Raghavan advised Banerjee that Petro Pharma was attempting to reach an out-of-court settlement with Habib Bank concerning its winding-up petition.

Banerjee admitted that he was extremely concerned about Petro Pharma's winding-up petition, but claims that he never spoke to anyone at Petro Pharma about it. Banerjee stated that he tried every day to reach a Petro Pharma officer, but none was available. Banerjee also claimed to have gone to Petro Pharma's offices at least three or four times, but was told that no officers were available. Banerjee even went to Ashok's house, which was locked, and learned from a neighbor that Ashok had not resided there for over a month. Banerjee did not, however, write any letters to Petro Pharma asking its officers to contact him.

Raghavan stated that Banerjee wanted to know how and when BOI would receive the money owed to it under the LOC. Raghavan advised Banerjee that Petro Pharma acknowledged its liability to BOI for the advanced funds and that it was a matter to be resolved between Ashok and Nayak, since Ashok had personally guaranteed repayment of moneys owed to BOI by Petro Pharma. Raghavan further explained to Banerjee that it would be improper for BOI to demand payment from Nord/LB under the LOC because Brenntag did not owe any money to Petro Pharma, and accordingly, it did not default. Raghavan further advised Banerjee that because the money was advanced under a stand-by letter of credit, as opposed to a documentary letter of credit, a default necessarily had to occur before a valid demand for payment could be made under the LOC.

Raghavan refused Banerjee's repeated requests for a fresh Default Letter. According to Raghavan, Banerjee acknowledged that he made these requests because he knew that the undated Default Letter which Petro Pharma provided to BOI in March 1996 was invalid because, among other things, it was co-signed by Prasad, who was no longer an authorized signatory. Raghavan further stated that Banerjee also acknowledged that he knew that Iyer, the other co-signatory on the Default Letter, had no independent authority to execute documents on behalf of Petro Pharma. According to Raghavan, because Petro Pharma refused to provide BOI with a new Default Letter, BOI date-stamped the Default Letter itself and presented it to Nord/LB with the knowledge that it was invalid.

Raghavan opined that BOI became anxious that Petro Pharma would not be able to repay the funds advanced under the LOC, and consequently, demanded payment by Nord/LB under the LOC even though it had unequivocally been told that it would be improper to do so. Banerjee denied the statements made in Raghavan's sworn Declaration.

Further, although BOI was aware that a receiver could be appointed for Petro Pharma at the March 14 hearing, BOI did not retain Singapore counsel to represent it at the hearing or in the winding-up affairs of Petro Pharma. Nor did anyone from BOI attend the March 14 hearing or follow-up with Habib Bank on March 14 to learn the results of the winding-up petition. According to Banerjee, it was not until March 21, 1997, when BOI received a letter from Petro Pharma's receiver, Mr. Medora, that BOI learned that a receiver had been appointed for Petro Pharma as of March 12, 1997.

### VIII. *March 17, 1997: BOI Presented Documents To Nord/LB In An Attempt To Draw Under The LOC*

On March 17, 1997, Nord/LB received, by DHL courier, BOI's demand for payment under the LOC in the amount of U.S. $2,452,167.43, dated March 14, 1997. Accompanying BOI's demand were copies of the following documents: Petro Pharma's invoices, the bill of lading, the Default Letter and Petro Pharma's covering letters. After examining the documents, Nord/LB found that the documents did not comply with the terms set forth in the LOC in a number of ways, and sent BOI a telex on March 18, 1997 informing BOI of these discrepancies and inconsistencies. On March 21, 1997, BOI sent Nord/LB a telex disputing these discrepancies. Many of these discrepancies are further discussed in the affidavit of Alan Bloodgood, filed on May 21, 1997, and can be summarized as follows:

1. The undated Default Letter is impermissible under the USCIB publication "STANDARD BANKING PRACTICE FOR THE EXAMINATION OF LETTER OF CREDIT DOCUMENTS."

2. The Default Letter was inconsistent with the bill of lading at the time of the "negotiation" on March 26, 1996 because the Bank of India could have determined from the face of the documents that 360 days had not lapsed as against the copy of the bill of lading presented and payment was clearly not due at the time of the Bank of India's "negotiation."

3. The Default Letter was inconsistent with the copy of the commercial invoice as stipulated in the Stand–By Letter because the Default Letter reflected an invoice of $2,483,605.48 which was inconsistent with the revised invoice amount of $2,452,167.12 presented to Bank of India on March 26, 1996. This discrepancy constitutes "data content" which is inconsistent with a stipulated document, and is not "purely incidental" under UCP 500 Article 21.

4. The Bank of India's cover letter dated March 14, 1997 requested remittance of $2,452,167.43, which exceeded the revised invoice amount of $2,452,167.12. Further, the cover letter amount was also inconsistent with the amount stated in the Default Letter of $2,483,605.48.

On March 27, 1997, Nord/LB sent BOI a telex which restated its belief that the documents presented by BOI were not in conformity with the LOC. In this telex, Nord/LB reminded BOI that Nord/LB had never received the original negotiable documents from Petro Pharma, as called for in the LOC.

To that end, Nord/LB requested from BOI a copy of the DHL receipt showing delivery to Nord/LB. BOI has never provided this DHL courier receipt to Nord/LB.

After BOI presented documents to Nord/LB in an attempt to draw under the LOC, attorneys for the Ashoks, Advani & Company, sent BOI a letter, dated March 26, 1997, instructing BOI to withdraw its claim, as it was "unauthorized and wrongfully lodged, as both the signatories were not in employment of Petro Pharma Pte. Ltd. on the material date, nor was the letter of default in accordance with the terms of the Letter of Credit." The Advani letter further states that Petro Pharma "did not issue you a claim/default letter as requested by you during the week of March 10–14, 1997 and that during meetings with the Senior Officials of Petro Pharma Pte. Ltd. you had specifically been asked not to negotiate the abovementioned Letter of Credit." The Advani letter also stated that the Ashoks may be personally liable for moneys owed to BOI, and accordingly, asked BOI for "a statement of your claim with copies of all supporting documents so that our clients could consider the same." BOI never submitted any such statement or supporting documents to Advani.

Banerjee denied that any discussions took place with Petro Pharma before March 14, 1997. He admitted, however, that Ashok had "detailed discussions" with officers in BOI's head office during the last week of April 1997, in which Ashok promised to pay BOI the amount due "as soon as possible as his personal dues." Further, Banerjee spoke with Ashok over the telephone two or three times after March 14, 1997, at which time Ashok asked Banerjee to withdraw the claim that was made by BOI under the LOC. Ashok told Banerjee that he would personally pay the money owed to BOI, but Nayak said that BOI "cannot withdraw that claim unless full amount is paid right away."

Meanwhile, BOI has taken no legal action against Petro Pharma or the Ashoks to en-force the Ashoks' personal guarantee. Banerjee claimed that the Ashoks are in India and that their guarantee, which was executed in Singapore, is not enforceable in India, despite the fact that the Ashoks are Indian citizens and that the Indian government is a shareholder of BOI, which is headquartered in India.

*Discussion*

### I. *Standard For Issuing A Preliminary Injunction*

Injunctive relief requires "a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). BOI contends that Brenntag has neither shown likelihood of success nor irreparable injury.

### II. *Brenntag Has Shown Likelihood of Success On The Merits Because BOI Is Not A Holder In Due Course Because The Documents Negotiated Were False On Their Face*

The issue presented is whether BOI, as a nominated negotiating bank under the LOC, validly negotiated the Default Letter from the beneficiary Petro Pharma that is required for presentment of the LOC to the issuing bank Nord/LB, where, among other things, the Default Letter was issued by the beneficiary approximately one year before the required statement in the Default Letter that payment had not been received and is due from Brenntag, the LOC applicant, could have been true.[2]

### A. *The LOC Is Governed By The UCP, Which Requires Negotiated Documents To Be Valid On Their Face*

▮ The LOC nominated BOI as negotiating bank. Article 10(d) of the UCP provides

---

2. Brenntag also contends that the injunction should issue because, among other things, BOI knowingly and intentionally submitted fraudulent documents to Nord/LB, including the default let-ter date stamped by BOI rather than Brenntag. This issue need not be reached, however, because the Court holds that the negotiation was invalid.

that: "By nominating another bank, or by allowing negotiation by any bank, or by authorizing or requesting another bank to add its confirmation, the Issuing Bank authorizes such bank to . . . negotiate . . . against documents which appear on their face to be in compliance with the terms and conditions of the Credit and undertakes to reimburse such bank in accordance with the provisions of these Articles." Accordingly, Nord/LB, as the issuer, authorized BOI to negotiate documents, and undertook to reimburse the BOI if it purchased documents under the LOC, but only if the documents are facially compliant with the LOC terms.

The standard for examination of documents is set forth in UCP Article 13(a), which provides that:

> Banks must examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit. Compliance of the stipulated documents on their face with the terms and conditions of the Credit, shall be determined by international standard banking practice as reflected in these Articles.

BOI's experts agree that at the time of the negotiation, BOI was bound to protect its right to reimbursement by the issuing bank to negotiate only against documents which appeared on their face to be in compliance with the terms and conditions of the credit. Professor E. Peter Ellinger ("Ellinger"), for example, opines that "[a]nother important principle, currently stated in article 14(a) of the UCP–500, is that the negotiating bank is entitled to enforce payment of the letter of credit only if the documents appear on their face to be in compliance with the credit (as stipulated in article 13(a) of the UCP–500)." [3]

Similarly, James E. Byrne, a consultant in the area of international banking operations, including letters of credit, opined that "[c]orrespondent banks [including nominated negotiating banks] are immune even from nonpayment due to the fraudulent actions of the beneficiary unless they themselves engaged

in fraud or had actual knowledge of it at the time they paid or purchased the documents. They act on the basis of documents as they appear on their face."

### B. *The Negotiated Default Letter Was Not Valid On Its Face, and Therefore BOI Did Not Validly Negotiate The LOC*

The LOC issued by Nord/LB was a stand-by letter, which is distinguishable from a documentary letter of credit. A stand-by letter of credit is meant only to "stand by" in the event that the applicant fails to make a direct payment to the beneficiary. Accordingly, the beneficiary must present to the issuing bank a "default letter" stating that no payment, or only partial payment, has been received as of a specified date. As Professor Ellinger stated, "[t]he object of [the LOC] was to provide a source of payment if Brenntag failed to perform its undertaking."

A documentary credit available by acceptance, on the other hand, would permit, for example, the beneficiary to present all the original shipping documents and a 360 days date draft drawn on a nominated bank or the issuing bank. That drawee bank, after examination of the documents for compliance with the terms and conditions of the credit, would accept that draft for payment on the due date. The beneficiary would then have the ability to discount that bankers acceptance either at the accepting bank or the acceptance could be discounted by the negotiating bank. With a documentary credit available by deferred payment, the beneficiary would normally present all the original shipping documents to either a nominated bank or the issuing bank. After examination of the documents for compliance with the terms and conditions of the credit, the obligated bank would incur a deferred payment obligation to pay on the due date. The beneficiary would normally then have the ability to discount that deferred payment obligation on the negotiating bank.

---

**3.** The Court has carefully considered Brenntag's motion to strike or disregard BOI's supplemental affidavit testimony, including the expert affidavits. The motion is without merit and therefore is denied.

■ Here, the LOC required submission of a default letter, purportedly signed by an authorized representative of Petro Pharma Pte Ltd., stating that payment, which was due 360 days after completion of loading, has not been received and is due from Brenntag International Chemicals, Inc. When BOI negotiated the LOC documents with Petro Pharma, and received the undated Default Letter, the statement contained therein that payment had not been received 360 days after completion of loading was not true, nor could it have been true. The Default Letter was therefore not valid on its face when it was negotiated by BOI, and therefore the negotiation is not valid under the UCP.

■ Brenntag cites two cases which, although governed by the Uniform Commercial Code (the "UCC") rather than the UCP, are analogous to the circumstances here.[4] Under the UCC, although the general rule is that the obligation of the issuer to pay the beneficiary is independent of any obligation involved in the underlying sales contract, there are certain exceptions that excuse the issuing bank from honoring drafts. Credit. Subdivision (2) of Section 5–114 of the U.C.C. provides in relevant part that:

> [u]nless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation ... or is forged or fraudulent or there is fraud in the transaction
>
> > (a) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course (Section 3–302) ...; and

(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

Accordingly, under the UCC, step one is to determine whether there is fraud in the transaction, and then step two is to determine whether the negotiating bank has taken the draft under circumstances which would make it a holder in due course.

In *Scarsdale Nat'l Bank and Trust Co. v. Toronto–Dominion Bank*, 533 F.Supp. 378, 385 (S.D.N.Y.1982), the court held that when a bank gives value for documents it knows to be false under a stand-by letter of credit, it negotiates in bad faith and loses its status as a holder in due course. The *Scarsdale* case involved a stand-by letter of credit which required certificates from the purchaser stating that the seller had performed certain duties required by the underlying contract. *Id.* at 379–80. The seller procured these certificates from the buyer prior to the seller's actual performance, promising that he would hold the certificates "in trust" until he had performed. *Id.* at 382–83. Instead of holding the certificates in trust, the seller negotiated under the letter of credit immediately, presenting the certificates to fulfill the documentary requirements. *Id.* at 383. The court found that the negotiating bank knew the certificates were fraudulent in that they did not reflect the actual conditions they purported to certify. *Id.* at 386–87. Because of this knowledge, the court held that the bank could not have received the documents in good faith, and appropriately declined to treat the bank as a holder in due course.

In *Andina Coffee, Inc. v. National Westminster Bank, USA*, 160 A.D.2d 104, 560

---

4. The Uniform Commercial Code provides that it "does not apply to a letter of credit or a credit if by its terms or by agreement, course of dealing or usage of trade such letter of credit or credit is subject in whole or in part to the [UCP]." N.Y.U.C.C. § 5–102(4) (McKinney 1991); *Alaska Textile Co., Inc. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813, 816–817 (2d Cir.1992). The UCP expressly applies to the Letter of Credit at issue in this case, and therefore only where the UCP is "silent or ambiguous" may analogous UCC provisions be utilized, and then only if those provisions are "consistent with the UCP." *Id.* at 822 (*citing Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, at 1542–1543 (S.D.N.Y.1985), *aff'd*, 808 F.2d 209 (2d Cir.1986)). As discussed above, the UCP is neither silent nor ambiguous concerning the requirement that negotiated documents be facially valid. *See* UCP art. 10, 13.

N.Y.S.2d 1, 2 (1st Dep't 1990), the court considered a transaction where letters of credit payable upon presentation of "interior truck bills of lading" financed a transaction for coffee which was never shipped. The negotiating bank took documents from the beneficiary including bills of lading which were dated six weeks into the future. *Id.* When the negotiating bank claimed that it was a holder in due course and was entitled to payment regardless of any fraud in the underlying transaction, the issuing bank countered that the negotiating bank was aware of the fraud. *Id.* Holding that the post-dated documents were "not only a departure from the requirements of the letters of credit but also ... a form of fraudulent practice," the court concluded that unless the post-dating was expressly allowed under the letters of credit, the documents did not comply with the terms thereof, and the bank was not entitled to payment. *Id.* at 4–5.

As in *Scarsdale* and *Andina Coffee,* BOI paid value for a document—the Default Letter—knowing that the it could not have reflected the actual condition it purported to certify, and was therefore fraudulent. Indeed, Banerjee admitted that when BOI accepted the undated Default Letter from Petro Pharma on March 22, 1996, the statement contained in the Default Letter—that "payment which was due 360 days after completion of loading has not been received and is due and owing from Brenntag"—was *not* true and could not have been true. Furthermore Banerjee conceded that: (1) in March 1996 Brenntag had not defaulted on any obligations it allegedly owed to Petro Pharma; (2) the Default Letter could not have been dated until after the due date (360 days after completion of loading); and (3) Petro Pharma never authorized BOI to date stamp the Default Letter when the due date arrived. Accordingly, the Default Letter negotiated by BOI were false on their face and therefore are not valid for presentment to Nord/LB for collection on the LOC.

BOI contends that Brenntag and Nord/LB knew or should have known that BOI was extending financing to Petro Pharma, although they are unclear on what the consequences of such knowledge would be on the instant issue. If the theory is that Brenntag or Nord/LB waived the requirement for the default letter, no waiver has been established. Under New York law, waiver is established if the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it. *See City of New York v. State,* 40 N.Y.2d 659, 669, 389 N.Y.S.2d 332, 357 N.E.2d 988 (1976); *Werking v. Amity Estates, Inc.,* 2 N.Y.2d 43, 52, 155 N.Y.S.2d 633, 137 N.E.2d 321 (1956).[5] Nord/LB sent BOI a telex on March 25, 1996 confirming, at BOI's request, that no payment had been made as of that date by Nord/LB directly to Petro Pharma outside the LOC and that any/all payments made in respect of the transaction would be made only to BOI. The statements by Nord/LB in the March 25th telex simply confirmed that no draws were made on the LOC. Certainly that had to be true as no draws could have been made under the LOC at that time. Nor did the March 25th telex constitute "assurances" from Nord/LB or Brenntag that any payment outside the LOC would come directly through Nord/LB to BOI. In fact, Banerjee conceded in his deposition that it had no assurances from Brenntag that any payments it made to Petro Pharma would be made only through Nord/LB.

Moreover, since Brenntag made no such assurances, BOI's contention that there could be no direct payment by Brenntag as "a matter of commercial reality" since Brenntag would risk having to pay the same amount twice—once to Petro Pharma outside the LOC and again to BOI under the LOC—is mistaken. No such risk of dual payment would exist as long as negotiation under the LOC is properly tied to an actual default by Brenntag, as contemplated by the LOC.

Nor has BOI established that Brenntag knew that BOI was advancing funds to Petro Pharma, although such knowledge alone would not constitute a waiver. Petro Phar-

---

**5.** Neither party has briefed the issue of what law would apply to waiver analysis. Because both parties rely on New York law on all issues but for the dispute regarding industry practices for negotiation of stand-by letters of credit, the Court will apply New York law to the waiver theory.

ma sent a memo to Brenntag requesting that certain telexes be sent to BOI so that Petro Pharma can obtain "approval for the packing loan." This memorandum makes no reference to discounting/negotiation under the LOC, a fact conceded by BOI. Further, Pichola testified that he was unfamiliar with the term "packing loan" and Sander from Nord/LB testified that he had no understanding of what a "packing loan" is and that it is not a term typically heard in the banking industry. BOI did not send a telex either advising them that they were contemplating negotiating the LOC on March 26, 1996, or asking them if they had received the original documents from Petro Pharma.

Finally, BOI's experts assert that negotiation of documents under a stand-by letter of credit prior to the date of maturity regularly occurs in Singapore letter of credit market, as well as other Asian markets. They contend that Singapore banking practice is relevant to interpretation of the LOC because the LOC nominates BOI Singapore office as the negotiating bank. They do not, however, cite any case—either in the United States or elsewhere—where they demonstrate precedent for their position. Nor do they reconcile their position with the LOC's plain meaning that the Default Letter must state that no payment has been made by Brenntag, and which must be true not at the date it was negotiated but at a time almost one year later. Finally, Brenntag's expert, Alan L. Bloodgood, flatly contradicts Ellinger's and Byrne's opinion and asserts that a stand-by letter of credit such as the one at issue here cannot be so negotiated, and that it is not standard practice in New York to do so. Accordingly, in the face of ambiguity regarding the industry custom, the plain language of the agreement and the incorporated UCP provisions must prevail.

The Court has carefully considered BOI's remaining contentions that Brenntag has failed to show likelihood of success, and finds them to be without merit.

### III. *Brenntag Has Established Irreparable Harm*

■ To succeed on a motion for a preliminary injunction, Brenntag must show ir-reparable harm. *Jackson Dairy,* 596 F.2d at 72. "[I]rreparable injury means injury for which a monetary award cannot be adequate compensation." *Id.* Courts have rejected requests to preliminarily enjoin payment on letters of credit when a monetary award would be sufficient. *Sperry Int'l Trade, Inc. v. Government of Israel,* 670 F.2d 8, 12 (2d Cir.1982) (vacating a district court order enjoining beneficiary from drawing on a letter of credit and stating that "it has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages [are] adequate compensation a preliminary injunction will not issue").

Courts have recognized, however, that irreparable injury may be found where insolvency threatens to frustrate a damage award. In *Drobbin v. Nicolet Instrument Corp.,* 631 F.Supp. 860, 912 (S.D.N.Y.1986) (Haight, D.J.), the court enjoined the holders of certain shares and warrants from disposing of them because monetary damages would be an inadequate remedy. The court reasoned that the share and warrant holders do not have "sufficient assets to pay any damages to which [movant] would be entitled in lieu of the shares." Id. at 912. The court concluded that "[w]here a plaintiff's injury is theoretically compensable in money damages but, as a practical matter, the defendant would not or could not respond fully for those damages, preliminary injunctive relief has been deemed necessary to protect the plaintiff from irreparable injury." Id. (citing *Teamsters Freight Local Union No. 480 v. Southern Forwarding Co.,* 424 F.Supp. 11, 13 & n. 13 (M.D.Tenn.1976)).

■ Here, Brenntag's ability to collect damages if the LOC is erroneously paid may be frustrated by the beneficiary Petro Pharma's insolvency and receivership. BOI contends, however, that if Nord/LB pays the LOC Brenntag may retain prospective monetary relief against BOI or Nord/LB. They contend that the existence of these alternative monetary claims against these solvent parties precludes a need for injunctive relief in this case.

BOI cites *Sturm, Ruger & Co., Inc. v. Chase Manhatten Bank, N.A.*, No. 93 Civ. 73165, 1994 WL 191512 (S.D.N.Y. May 17, 1994) in support of its position. In *Sturm*, the court denied plaintiff's motion for a preliminary injunction enjoining chase Manhattan Bank ("Chase") from paying Turkiye Is Bankasi, A.S. ("Isbank") under letters of credit Chase had issued on behalf of the plaintiff. *Id.* at \*3. The court rejected plaintiff's contention that it would suffer irreparable injury if Chase paid Isbank under the credit. *Id.* Plaintiff's assertion of "irreparable harm" was founded upon allegations that it would not be able to recover the funds from Isbank, that it would have no claim against the party with whom it contracted, and that a wrongful honor claim against Chase was an insufficient remedy. *Id.* The court noted that "[l]osing on the merits is not tantamount to irreparable injury" and that the plaintiff "does not suffer irreparable injury simply because it may not be able to prevail in a wrongful honor claim against Chase or in a fraud claim against Isbank, or because it might lose in the underlying dispute with [the contracting party]." *Id.* Accordingly, movant failed to demonstrate irreparable injury.

*Sturm*, however, did not involve a beneficiary in receivership. Nor did *Sturm* involve a request for payment by a negotiating bank—the letters of credit were drawn upon by the beneficiary. Although none of the parties have adequately briefed the legal issues of which entity—BOI, Nord/LB, or Petro Pharma—would bear the ultimate liability for payment of the LOC on invalidly negotiated documentation, it remains possible that Petro Pharma's insolvency will frustrate a full recovery by Brenntag. Accordingly, Brenntag has established a sufficiently likelihood of irreparable harm to warrant a preliminary injunction.

## IV. *Preliminary Injunction Here Is Not Prohibited By Foreign Sovereign Immunity Act*

BOI cross-moved for judgement on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. On a motion for judgment on the pleadings "[a]ll allegations in the complaint must be accepted as true; all inferences must be drawn in favor of the plaintiff." *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir.1996).

BOI contends that since the FSIA bars prejudgment attachment, the injunction Brenntag seeks would provide an equivalent remedy and therefore must also be denied. BOI relies on the FSIA section providing that "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." [6] 28 U.S.C. § 1609.

BOI relies on *S & S Machinery Co. v. Masinexportimport*, 706 F.2d 411 (2d Cir. 1983). In *S & S Machinery*, the plaintiff financed its purchase of machinery and parts "by certain irrevocable letters of credit" issued to the defendant Romanian bank as collection agent for the co-defendant Romanian seller, and subsequently sued for damages and obtained an order of attachment levying the defendants' assets after the delivered goods proved unsatisfactory. 706 F.2d at 412. Following removal of the case from state court, the district court continued the state-court orders of attachment and "also enjoined 'any and all negotiation of drafts or other negotiable paper pursuant to the ... letters of credit.'" *Id.* at 413. Upon defendant's motion to vacate, the district court vacated the order of attachment and "dissolv[ed] the injunction against negotiation of the letters of credit" pursuant to the FSIA. *Id.* The Second Circuit affirmed, holding that a continued injunction "could only have resulted in the disingenuous flouting of the FSIA ban on prejudgment attachment." *Id.* Once the court properly held that the defendants had not "explicitly waived" their immunity and were protected from prejudgment attachment, *see id.* at 417–18, "the court

---

**6.** There is no dispute that none of the exceptions to immunity provided under sections 1610 or 1611 apply in this case.

properly refused to sanction any other means to effect the same result," *id.* at 418. The Second Circuit concluded "that courts in this context may not grant, by injunction, relief which they may not provide by attachment." *Id.*

*S & S Machinery*, however, does not address the issue presented here, which is whether a stand-by letter of credit is the property of a negotiating bank where the documents were rejected by the issuing bank for, among other reasons, facial invalidity. In *S & S Machinery*, the parties did not dispute that the letters of credit were defendants' property at the time the attachment was granted. *S & S Machinery Co. v. Masinexportimport*, 82 Civ. 4890 (S.D.N.Y. Dec. 8, 1982), *aff'd*, 706 F.2d 411 (2d Cir.1983); *see also S & S Machinery*, 706 F.2d at 413. Here, however, Brenntag contends that Nord/LB's obligation to pay under the LOC is not BOI's "property" for purposes of the FSIA immunity.

Neither party here cites cases directly on point. The cases cited by Brenntag all involve the question of whether an executory letter of credit is the property of the beneficiary for attachment purposes. *See Supreme Merchandise Co., Inc. v. Chemical Bank*, 70 N.Y.2d 344, 346, 520 N.Y.S.2d 734, 734, 514 N.E.2d 1358 (1987) ("A beneficiary's interest in an executory negotiable letter of credit supporting an international sale of goods is not property of the beneficiary for purposes of attachment."); *Diakan Love, S.A. v. Al–Haddad Bros. Enterprises, Inc.*, 584 F.Supp. 782, 784 (S.D.N.Y.1984) ("[T]he beneficiary's interest in an executory letter of credit is not attachable property."); *Ferrostaal Metals Corp. v. S.S. Lash Pacifico*, 652 F.Supp. 420, 424 (S.D.N.Y.1987) ("[T]he interest of a beneficiary in an open letter of credit" could not be effectively attached because the open letter was neither the "property" of, nor a "debt" owed to, the foreign defendant). Here, BOI is the negotiating bank, and not a beneficiary. Moreover, BOI has presented documents to Nord/LB, who has refused to honor them. Therefore the LOC is not executory. *Cf. Supreme Merchandise*, 70 N.Y.2d at 346, 520 N.Y.S.2d at 734, 514 N.E.2d 1358 (recognizing that letter of credit was "executory" when order of attachment was served on issuing bank only because it was "served before [the negotiating banks] negotiated the drafts for value and presented them to [the issuing bank] for payment").

As discussed above, BOI did not validly negotiate for the letter of credit documents because the Default Letter was invalid on its face. Assuming that a negotiating bank could acquire a property interest in the LOC, such property interest must depend on valid negotiation for the LOC documents. Accordingly, BOI did not acquire a property interest in Nord/LB's obligation to pay under the LOC.

## Conclusion

For the reasons set forth above, Brenntag's motion for a preliminary injunction to enjoin payment under Irrevocable Stand–By Letter of Credit No. 190397 is granted, and BOI's motion is denied. In view of the complete factual submission by the parties in connection with the preliminary injunction hearing, the parties may wish to stipulate to the finality of the preliminary injunction. If not, the parties shall complete any additional discovery by August 17, 1998, and submit a pretrial order on August 31, 1998. The trial will be held on September 30, 1998.

It is so ordered.